Docket Nos. 94780, 94900 cons.–Agenda 6–May 2003.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CRAIG A. HANNA 
et al.
, Appellees–THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DAVID D. VAUGHN 
et al.
, Appellees.

Opinion filed October 17, 2003.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

At issue in this case is whether certain devices for measuring breath alcohol were properly tested by the Illinois Department of Public Health before being approved for use as evidential breath analysis instruments in Illinois. In two decisions, the appellate court concluded that they were not. 332 Ill. App. 3d 527; Nos. 5–01–0912, 5–01–0914 cons. (unpublished order under Supreme Court Rule 23). We consolidated these decisions for review and now reverse the judgments of the appellate court.

BACKGROUND

The defendants in this case were each arrested for driving under the influence of alcohol in unrelated incidents which occurred in either 1999 or 2000. Each defendant submitted to breath testing and each defendant recorded a breath-alcohol level above the legal limit. Following their arrests, four of the defendants, Craig A. Hanna, Kathryn R. Price, Keith Ryan O’Loughin and Gordon R. Pruett, were prosecuted in the circuit court of Williamson County for driving under the influence of alcohol. The remaining two defendants, David D. Vaughn and Kevin L. Johnson, were prosecuted in the circuit court of Johnson County for the same offense.

Williamson County Defendants

Prior to their trials, the four Williamson County defendants, who were all represented by the same attorney, filed separate but similar motions in which they sought to suppress the results of their breath tests. In these motions, defendants alleged that the particular makes and models of the breath testing devices which the police had used to measure their breath-alcohol levels were not properly tested by the Illinois Department of Public Health (Department) before being placed on the Department’s list of approved evidentiary breath analysis instruments. From this, defendants argued that the breath testing devices used in their cases should not have been in use in Illinois, and that the results of their breath tests should therefore be suppressed. Defendants did not allege in their motions that the results of their breath tests were, in fact, invalid or unreliable.

The suppression argument made by the Williamson County defendants was premised on the regulatory scheme for breath testing devices found in section 11–501.2 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11–501.2 (West 1998)) and section 510.40 of title 77 of the Illinois Administrative Code (title 77) (77 Ill. Adm. Code §510.40 (1996)). Section 11–501.2 of the Vehicle Code governs the admissibility of breath test results in prosecutions for driving under the influence of alcohol. See 
People v. Keith
, 148 Ill. 2d 32, 41 (1992). At the time defendants were given their breath tests, section 11–501.2(a)(1) authorized the Department to certify the accuracy of breath testing equipment used for evidentiary purposes and to prescribe regulations necessary for the certification process. Section 11–501.2(a)(1) also provided that, to be “considered valid” at trial, breath-alcohol testing had to be performed according to the standards promulgated by the Department. 625 ILCS 5/11–501.2(a)(1) (West 1998).
(footnote: 1)
 Before 2001, the Department had in place a set of administrative regulations which governed the certification process for evidential breath analysis instruments. These regulations, set forth in section 510.40 of title 77 (77 Ill. Adm. Code §510.40 (1996)), contained a number of requirements that had to be met before a particular make and model of breath testing equipment could be listed by the Department as certified or approved for evidentiary purposes. See 77 Ill. Adm. Code §510 app. B (2000) (listing approved devices). One of these requirements, found in subsection (c) of section 510.40, stated that evidential breath analysis instruments “will be tested and approved by the Department in accordance with but not limited to the Standards for Devices to Measure Breath Alcohol promulgated by the National Highway Traffic Safety Administration” and found in certain federal regulations published in 1984 and 1993. 77 Ill. Adm. Code §510.40(c) (1996).
(footnote: 2)
 Before the circuit court, defendants alleged that, under the standards adopted by the National Highway Traffic Safety Administration (NHTSA), a breath testing device had to be subjected to, among other things, an input power test, an ambient temperature test and a vibrational stability test before the device could be approved for use as an evidential breath measurement device by the NHTSA. See 49 Fed Reg. 48859-60 (1984); 58 Fed. Reg. 48708 (1993). Defendants further alleged that these three tests were not performed by the Department on the devices which had been used to conduct their breath tests. Defendants therefore argued that the devices had not been tested “in accordance with” the NHTSA standards as required by section 510.40(c) of title 77 and that the results of their breath tests could not be “considered valid” under section 11–501.2(a)(1) of the Vehicle Code.

The circuit court of Williamson County consolidated defendants’ cases to consider their motions to suppress. On April 17, 2001, a hearing was held on the motions. At that hearing, defendants introduced the testimony of one witness, Larry D. Eztkorn.

Etzkorn testified that he was the division chief for the alcohol and substance testing program at the Department of Public Health from 1992 until 2001, at which time the responsibility for approving breath testing devices was transferred to the Illinois Department of State Police. Eztkorn stated that he was currently the technical director or supervisor of the breath-alcohol program for the State Police. Eztkorn also stated that while he was employed by the Department of Public Health, he was in charge of the program which approved evidential breath testing devices for use in Illinois.

Eztkorn was questioned about the standards adopted by both the Department and the NHTSA for approving evidential breath testing equipment. Eztkorn acknowledged that a breath testing device could not be approved by the NHTSA for evidentiary use unless the device was first subjected to an input power test, an ambient temperature test and a vibrational stability test. Etzkorn also acknowledged that these tests were not performed on three models of breath testing devices which defense counsel cited as being on the Department’s list of approved evidential breath analysis instruments: the “Intoxilyzer 3000,”
(footnote: 3) the Intoxilyzer 5000 and the Intox EC/IR. However, Eztkorn testified that, in his view, the Department was not required to perform the tests on those devices. Eztkorn gave two general reasons as to why he believed this was so.

First, according to Eztkorn, the language of section 510.40(c) of title 77 did not impose a testing requirement. Eztkorn noted that, although section 510.40(c) referred to the NHTSA standards and regulations, the federal regulations themselves did not require the states to perform any testing. Instead, with respect to the states, the NHTSA regulations were only nonbinding recommendations or guidelines. Further, the NHTSA regulations contemplated that some states would adopt their own, individualized testing requirements. The Department had adopted its own testing program, Eztkorn explained, and had performed some tests, such as testing for interference from radio waves, that were not done at the federal level. Moreover, Eztkorn stated that he had drafted portions of the current, revised version of section 510.40(c) and, in particular, had added the phrase “not limited to” which appears in the regulation. Eztkorn testified that it “was never [his] intent” when drafting the changes to section 510.40(c) to adopt all the federal testing standards. Rather, according to Eztkorn, the federal standards were meant to be used for guidance only and the Department had the discretion, under section 510.40(c), to select its own testing requirements.

Eztkorn’s second answer as to why the Department was not required to perform the tests on the breath analysis devices was that the tests simply were not relevant to the way in which the devices were used in Illinois. Eztkorn explained that the input power test, the ambient temperature test and the vibrational stability test were needed if the breath testing device was not kept in a stable or controlled environment. Thus, for example, a device would need to be tested for accuracy under various power inputs if it was drawing power from a generator, as might be the case if it was being used in a remote area of the country such as rural Montana. Eztkorn explained, however, that in Illinois, the breath testing devices at issue were all placed in police stations and that the stations themselves were on a power grid. The devices thus drew a stable supply of electricity and, as such, did not need to be subjected to a power input test. The ambient temperature test was also not relevant, Eztkorn stated, because the devices were kept “in a controlled environment in a room in a police station, normally heated.” Similarly, since the devices were kept in police stations, the Department “didn’t test for [vibrational stability] because it didn’t make sense for the state of Illinois to test for that.” According to Eztkorn, because the breath testing devices at issue were kept in stable environments, the three tests required by the NHTSA were “not necessary in the state of Illinois,” it would not “make any sense to do that testing,” and it would be “a waste of resources” to perform the testing. Eztkorn also explained that the Department did not have the necessary equipment to perform the tests. Finally, according to Eztkorn, the three tests had already been performed by the NHSTA on the models at issue in this case. The devices had all passed the tests and the Department was aware of those results.

Following the hearing, the circuit court granted defendants’ motions to suppress. The circuit court initially found that the NHTSA standards required an input power test, an ambient temperature test and a vibrational stability test; that the models of breath analysis instruments at issue in this case had been fully tested and approved by the NHTSA; and that the Department had received information from the NHTSA to that effect. The court also found that the three tests had not been performed by the Department itself on the breath analysis instruments. In passing, the circuit court noted that Eztkorn had testified at the hearing on defendants’ motion to suppress but the court did not otherwise discuss his testimony.

After making its findings, the circuit court concluded that the Department’s failure to repeat the NHSTA tests meant that the defendants’ breath test results had to be suppressed. The court stated:

“[Section 510.40(c)] uses simple, clear and concise language. This section has no ambiguity. This section requires the Department to test and approve all machines ‘... in accordance with but not limited to the Standards for Devices to Measure Breath Alcohol promulgated by the National Highway Traffic Safety Administration... .’ The Department did not conduct the required testing before placing the [Intoximeter 3000] and the Intoxilyzer 5000 on the list of approved models for use in Illinois as Approved Breath Testing Instruments.”

The circuit court further concluded that the “NHTSA testing and approval is irrelevant” since “[f]or whatever reason, the Department chose to require its own testing to be conducted.” Thus, because the Department had not itself performed the three tests, the circuit court determined that the “machines were not properly approved for use in Illinois pursuant to the regulations” and that the results of defendants’ breath tests had to be suppressed.

The State filed a certificate of substantial impairment and appealed. 145 Ill. 2d R. 604(a)(1). The appellate court affirmed. 332 Ill. App. 3d 527. Stating that it “could not agree more” with the circuit court, the appellate court held that the plain language of section 510.40(c) of title 77 required the Department to perform the same tests on the breath analysis instruments that were performed by the NHTSA under its standards. And, since the Department did not perform those tests, the appellate court concluded that the circuit court properly suppressed the results of the defendants’ breath tests.

We granted the State’s petition for leave to appeal and docketed the appeal in this court as cause No. 94780.

Johnson County Defendants

Prior to their trials, the two Johnson County defendants filed motions 
in limine 
which sought to bar the State from using the results of their breath tests at trial. The motions contained arguments identical to those in the Williamson County defendants’ motions to suppress. The Johnson County defendants also submitted to the circuit court a transcript of the evidentiary hearing which was conducted in Williamson County.

After concluding that the Department had not properly tested the breath analysis instruments at issue before approving them for use, the circuit court granted the defendants’ motions 
in limine
. The State appealed. See 
Keith
, 148 Ill. 2d at 38-39 (appeal properly brought by the State from a motion 
in limine 
which had the effect of suppressing evidence).

Relying on its previous decision in the appeal taken from the Williamson County cases, the appellate court summarily affirmed. Nos. 5–01–0912, 5–01–0914 cons. (unpublished order under Supreme Court Rule 23). We granted the State’s petition for leave to appeal. We docketed the appeal in this court as cause No. 94900 and consolidated the case with cause No. 94780 for review.

ANALYSIS

Section 510.40(c) of title 77 states that breath analysis instruments “will be tested and approved by the Department in accordance with but not limited to the Standards for Devices to Measure Breath Alcohol promulgated by the National Highway Traffic Safety Administration.” 77 Ill. Adm. Code §510.40(c) (1996). Before this court, defendants contend that, under the plain language of section 510.40(c), the Department was required to perform the same tests on the breath analysis instruments at issue in this case that were conducted by the NHTSA. Because three of the NHTSA tests–the power input test, the ambient temperature test and the vibrational stability test–were not done by the Department, defendants contend that the Department’s testing was not “in accordance with” the NHTSA standards and, therefore, that the results of their breath tests should be suppressed.

In response, the State disputes defendants’ reading of section 510.40(c). The State acknowledges that, under section 510.40(c), the Department must test the breath analysis instruments “in accordance with” the standards adopted by the NHTSA. The State observes, however, that the federal guidelines are guidelines only; they do not impose a mandate upon the states to perform the three tests at issue here. The State further notes that the federal guidelines expressly permit a state to rely upon the testing done by the NHTSA (see 49 Fed. Reg. 48855 (1984)). Therefore, the State argues, the Department tested “in accordance with” the federal standards even if they did not repeat every test conducted by the NHTSA.

The State also argues that the appellate court’s construction of section 510.40(c) must be rejected because it leads to absurd results. Citing to Eztkorn’s testimony, the State argues that the three NHTSA tests have no relevance to how the breath analysis instruments at issue in this case are used in Illinois. The State also notes that, according to Eztkorn, the Department did not have the equipment necessary to perform the tests. The State maintains, therefore, that adopting the appellate court’s construction of section 510.40(c) would mean accepting the proposition that the Department intended to force itself to spend time and money to duplicate irrelevant tests which it did not have the equipment to perform. According to the State, “[v]ery few results could be more absurd than this.”

We agree with the State that the appellate court’s interpretation of section 510.40(c) of title 77 cannot be correct in light of the absurd consequences that stem from that interpretation. The principles that lead to this conclusion are well established. Administrative regulations have the force and effect of law and are construed according to the same standards that govern the construction of statutes.
 Union Electric Co. v. Department of Revenue
, 136 Ill. 2d 385, 391 (1990). The cardinal rule of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the legislature’s intent.
 In re Detention of Lieberman
, 201 Ill. 2d 300, 307 (2002). The most reliable indicator of legislative intent is found in the language of the statue itself (
Michigan Avenue National Bank v. County of Cook
, 191 Ill. 2d 493, 504 (2000)) and that language should be given its plain, ordinary and popularly understood meaning (
Carver v. Sheriff of La Salle County
, 203 Ill. 2d 497, 507 (2003)).

However, where a plain or literal reading of a statue produces absurd results, the literal reading should yield: “It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. *** If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity.” 
Church of the Holy Trinity v. United States
, 143 U.S. 457, 459-60, 36 L. Ed. 226, 228, 12 S. Ct. 511, 512 (1892). See also, 
e.g.
, 
Public Citizen v. United States Department of Justice
, 491 U.S. 440, 453-55, 105 L. Ed. 2d 377, 391-92, 109 S. Ct. 2558, 2566-67 (1989); 
Watt v. Alaska
, 451 U.S. 259, 266, 68 L. Ed. 2d 80, 88, 101 S. Ct. 1673, 1677-78 (1981); 
Croissant v. Joliet Park District
, 141 Ill. 2d 449, 455 (1990) (“Statutes are to be construed in a manner that avoids absurd or unjust results”); 
People ex rel. Cason v. Ring
, 41 Ill. 2d 305, 312-13 (1968) (when the literal construction of a statute would lead to consequences which the legislature could not have contemplated, the courts are not bound to that construction); V. Dougherty, 
Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation
, 44 Am. U.L. Rev. 127, 127-28 (1994) (“The absurd result principle in statutory interpretation provides an exception to the rule that a statute should be interpreted according to its plain meaning”).

The principle that statutory language should not be construed to produce an absurd result is a deeply rooted one. Over 130 years ago, the United States Supreme Court interpreted a statute which, under its plain terms, made it illegal in all instances to obstruct the passage of mail or a mail carrier. The Court held that the statute did not apply to a sheriff who executed an arrest warrant against a mail carrier while he was delivering mail. In so holding, the Court cited two instances, both centuries old, where the plain language of a law was not followed because doing so produced an absurd result:

“The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, ‘that whoever drew blood in the streets should be punished with the utmost severity,’ did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire–‘for he is not to be hanged because he would not stay to be burnt.’” 
United States v. Kirby
, 74 U.S. 482, 487, 19 L. Ed. 278, 280 (1869).

More recently, Judge Posner has explained the rule that absurd results are to be avoided, even in the face of plain language:

“Usually when a statutory provision is clear on its face the court stops there, in order to preserve language as an effective medium of communication from legislatures to courts. If judges won’t defer to clear statutory language, legislators will have difficulty imparting a stable meaning to the statutes they enact. But if the clear language, when read in the context of the statute as a whole or of the commercial or other real-world (as opposed to law-world or word-world) activity that the statute is regulating, points to an unreasonable result, courts do not consider themselves bound by ‘plain meaning,’ but have recourse to other interpretive tools in an effort to make sense of the statute. E.g., 
Public Citizen v. U.S. Dept. of Justice
, 491 U.S. 440, 453-55, 109 S. Ct. 2558, 105 L. Ed. 2d 337 (1989); 
Green v. Bock Laundry Machine Co.
, 490 U.S. 504, 527, 109 S. Ct. 1981, 104 L. Ed. 2d 557 (1989) (Scalia, J., concurring); 
AM Int’l, Inc. v. Graphic Management Associates, Inc.
, 44 F.3d 572, 577 (7th Cir. 1995); Veronica M. Dougherty, ‘Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation,’
 44 Am. U.L. Rev. 127 
(1994). They do not want to insult the legislature by attributing absurdities to it.” 
Krzalic v. Republic Title Co.
, 314 F.3d 875, 879-80 (7th Cir. 2002).

In the case at bar, Eztkorn testified that the breath testing devices at issue were all kept in the stable environment of a police station and, thus, were not exposed to power fluctuations, vibrations, or temperature extremes. Because the devices were not exposed to these conditions, Eztkorn explained, it would not “make any sense” and was “not necessary in the state of Illinois” to perform a power input test, an ambient temperature test or a vibrational stability test on the breath analysis instruments. Further, according to Eztkorn, the Department did not have the equipment to conduct the tests.

During the suppression hearing, defense counsel did not challenge any of Eztkorn’s assertions regarding the use of breath testing devices in Illinois. Eztkorn was the individual in charge of the Department’s program which approved evidential breath testing devices for use in Illinois and was unquestionably qualified to speak to the issue of how breath testing devices are used in this state. No other witness testified at the hearing. Eztkorn’s sworn testimony was unimpeached and uncontradicted and, further, has not been called into question on appeal. We are not free to ignore undisputed evidence of record. Accordingly, we take it as true, for purposes of this appeal, that the input power test, the ambient temperature test and the vibrational stability test have no relevance to the way the breath devices at issue in this case are used in Illinois.

When viewed within the real-world activity that section 510.40(c) of title 77 was intended to regulate, the interpretation of section 510.40(c) adopted by the appellate court below produces decidedly absurd results. If we were to conclude, as the appellate court did, that section 510.40(c) required the Department to conduct the three tests at issue, then we would have to assume that the Department drafted a regulation which required it to perform irrelevant and unnecessary testing, for which it had no equipment and which, as a consequence, would prevent it from approving any breath testing device for use in Illinois. We decline to attribute such nonsensical intentions to the Department. 
Cf
. 
Public Citizen
, 491 U.S. at 453 & n.9, 105 L. Ed. 2d at 391 & n.9, 109 S. Ct. at 2566 & n.9 (rejecting the “straightforward reading” of a statute because that reading would ascribe an “outlandish” intent to Congress). Accordingly, even if the appellate court was correct, and a plain or literal reading of section 510.40(c) would indicate that the tests at issue had to be performed, we reject that interpretation of section 510.40(c) here.

The courts below did not discuss Eztkorn’s testimony regarding the use of breath testing equipment in Illinois or consider the impact of his testimony upon the proper interpretation of section 510.40(c) of title 77. In cause No. 94780, the appellate court acknowledged the existence of Eztkorn’s testimony but then mentioned only that part of the testimony in which Eztkorn explained his intentions as a drafter of section 510.40(c). According to the appellate court, “Eztkorn had testified that, in drafting the regulation, he never intended to require testing for input voltage stability, ambient temperature stability and vibrational stability.” 332 Ill. App. 3d at 531. Having described Eztkorn’s testimony solely in these terms, the appellate court declined to consider it. The appellate court reasoned that, because it had determined that the meaning of section 510.40(c) was clear and unambiguous, it could not give any consideration to Eztkorn’s testimony about drafting the regulation. 332 Ill. App. 3d at 530-31.

As we have noted, however, Eztkorn’s testimony was not limited to an explanation of his intent when he drafted the revisions to section 510.40(c). Eztkorn also testified as to the factual or historical question of how breath testing devices are used in Illinois. Neither the circuit courts nor the appellate court in this case made any mention of Eztkorn’s testimony on this issue. This was error. The process of statutory interpretation should not be divorced from a consideration of the “real-world activity” (
Krzalic
, 314 F.3d at 880) that the statute is intended to regulate. Indeed, this court has long held that, in seeking legislative intent, “the court 
will always 
have regard to existing circumstances, contemporaneous conditions, the object sought to be attained by the statute and the necessity or want of necessity for its adoption.” (Emphasis added.) 
Smith v. County of Logan
, 284 Ill. 163, 165 (1918). See also, 
e.g.
,
 Collins v. Board of Trustees of the Firemen’s Annuity & Benefit Fund
, 155 Ill. 2d 103, 112 (1993) (“Existing circumstances at the time the statute was enacted, contemporaneous conditions, and the object sought to be achieved all may be considered”);
 Kotecki v. Cyclops Welding Corp.
, 146 Ill. 2d 155, 168 (1991). Further, in determining the intent of the legislature, a court “may properly consider 
not only the language of the statute
, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved.” (Emphasis added.) 
Lieberman
, 201 Ill. 2d at 308, citing 
People v. Pullen
, 192 Ill. 2d 36, 42 (2000); 
Stern v. Norwest Mortgage, Inc.
, 179 Ill. 2d 160, 164 (1997);
 People v. Frieberg
, 147 Ill. 2d 326, 345 (1992). See generally 2A N. Singer, Sutherland on Statutory Construction §48:03 (6th ed. 2000).

We previously cited the centuries-old Bolognian law which stated “that whoever drew blood in the streets should be punished with the utmost severity,” and the United States Supreme Court’s agreement that it would be absurd to apply that law to a “surgeon who opened the vein of a person that fell down in the street in a fit.” 
Kirby
, 74 U.S. at 487, 19 L. Ed. at 280. In the case at bar, to hold that Eztkorn’s testimony regarding the use of breath testing devices may not be considered would be the equivalent of saying that a court charged with construing the Bolognian law could not consider the testimony of the surgeon explaining that he only drew blood in an effort to help the person who had fallen in a fit. No rule of construction requires a court of law to turn a blind eye to reality in this way. See, 
e.g.
, 44 Am. U.L. Rev. at 150-52 (noting that, under the absurd result principle, a court is not limited to considering only the internal, formal logic of a statute). Accordingly, even if the appellate court was correct to ignore the legislative history of section 510.40(c), 
i.e.
, Eztkorn’s testimony regarding the drafting of the regulation, it was not correct to ignore the reality of how breath testing devices are used in this state.

The courts below failed to acknowledge or consider the real-world activity–the use of breath testing devices in Illinois–that section 510.40(c) was designed to regulate. When that real-world context is taken into account, the appellate court’s construction of section 510.40(c) is clearly untenable and must be rejected. Having rejected the appellate court’s interpretation of section 510.40(c) of title 77, the remaining possible interpretation of the regulation, and the one which we now adopt, is that the Department was not required to perform the input power test, the ambient temperature test and the vibrational stability test on the breath analysis instruments at issue. Because the tests were not required, the circuit courts of Williamson and Johnson Counties erred in granting defendants’ motions to suppress and motions 
in limine
.

CONCLUSION

For the forgoing reasons, the judgments of the appellate and circuit courts in cause No. 94780 and cause No. 94900 are reversed. Cause No. 94780 is remanded to the circuit court of Williamson County and cause No. 94900 is remanded to the circuit court of Johnson County for further proceedings consistent with this opinion. 

No. 94780–Appellate court judgment reversed
;

circuit court judgment reversed
;

cause remanded
.

No. 94900–Appellate court judgment reversed
;

circuit court judgment reversed
;

cause remanded
.

FOOTNOTES
1:     
1
Section 11–501.2(a)(1) has been amended since the time of defendants’ arrests. Since January 2001, the authority to certify the accuracy of breath testing equipment has resided with the Illinois Department of State Police. See 625 ILCS 5/11–501.2(a)(1) (West 2002).

2:     
2
Under current regulations promulgated by the Illinois Department of State Police, only breath testing devices which have been approved for use by the NHTSA may be approved for use in Illinois. Testing at the state level is no longer required. See 20 Ill. Adm. Code §1286.210 (2002).

3:     
3
In the proceedings below, and in this court, the parties have referred to the “Intoxilyzer 3000" as one of the models included on the Department’s list of approved evidential breath analysis instruments. However, there is no such model on the Department’s list. The device the parties presumably meant to reference is the Intoximeter 3000, which does appear on the list. See 77 Ill. Adm. Code §510 app. B (2000). See also G. Sapir, M. Giangrande & A. Peters, 
Breath Alcohol Machines: Evidence Foundation Requirements in Illinois
, 22 J. Marshall L. Rev. 1, 9 n.40 (1988) (noting that the “Intoxilyzer 3000” does not exist, although the name is sometimes mistakenly used). The parties’ error does not affect our analysis in this case.