MABEL VINCENT, a Disabled Person, by Janice Reed, Her Daughter and Next Friend, Plaintiff-Appellee, v. THE DEPARTMENT OF HUMAN SERVICES, Defendant-Appellant.

Third District    No. 3—08—0096

Opinion filed June 18, 2009.

McDADE, J., specially concurring.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Rachel Murphy (argued), Assistant Attorney General, of counsel), for appellant.

Virgil A. Thurman (argued), of Geneseo, for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

This action was brought by the plaintiff, Janice Reed, as next friend of Mabel Vincent, her mother, against the Illinois Department of Human Services (IDHS or Department). The Department determined that Mabel Vincent had "available assets" of $138,119, as defined by the Social Security Act, also popularly known as the Medicaid Act (the Medicaid Act) (42 U.S.C. §1396 *et seq.* (2006)). These funds were held in the Fred and Mabel Vincent Trust established by Mabel and her late husband in 1991. The Department determined that Mabel was required to "spend down" this amount before Medicaid would cover the medical expenses associated with her long-term nursing home care. The plaintiff appealed the Department's decision to the circuit court of Henry County, which reversed the Department's decision. The Department then sought review in this court. For the following reasons, we reverse the judgment of the circuit court and affirm the decision of the Department.

## FACTS

Mabel Vincent was born February 9, 1910. On August 29, 1991, she and her husband, Fred Vincent, placed assets worth $333,391 in an irrevocable trust, naming themselves as beneficiaries and their daughter, Janice, as trustee. The stated purpose of the trust was "to provide extra funds necessary for [Fred and Mabel's] happiness over and above the essential, primary support services such as *** medical care and support which [they] expect will be provided to [them] through federal, state and local governmental sources." To that end, the trust provided that for purposes of determining Fred's or Mabel's

eligibility for public aid, "no part of the principal or income of this Trust shall be considered owned by [him or her]." Rather, "Trust assets are to be used only when governmental aid is not available."

The trust was "intended to be a discretionary trust," and granted the trustee the "absolute discretion to determine if and when the [beneficiaries] need extra funds to supplement existing public or private funds and services" and to "pay out or withhold payment of Trust income or principal as she evaluates [their] needs." However, the trust provided that the trustee "must never use any income or principal *** to provide any goods or services for [Mabel and Fred] if [either] qualif[ies] to receive that benefit or service through any other public assistance programs." The trust provided that if the trustee, in her exclusive discretion, determined that continued distributions would result in reduced public assistance, she had the power to terminate such distributions. Upon termination of the trust, the remaining trust assets are to be distributed to Janice and her brother.

Over the years, Janice distributed approximately $2,500 per month from the trust for Mabel's and Fred's care. Upon Fred's death in 1992, Mabel became the sole beneficiary of the trust. Janice testified at hearing that she provided care to Mabel in Mabel's home from 2000 to 2005. However, there was no evidence presented that Janice and Mabel entered into any agreement providing for Janice to be paid for her care of Mabel. On May 4, 2005, Mabel suffered a stroke and entered Hillcrest Nursing Home in Henry County, Illinois.

On June 16, 2005, Mabel, acting through Janice, applied for public aid (Medicaid) with the Department. At that time, the trust had a value of $138,119. The Department included the value of the trust in assessing Mabel's available assets and calculated that she had to "spend down" $136,119 before she would need public assistance. The Department notified Mabel of the decision that she was eligible for public aid only after she had spent $136,119 on her own care and that she had 60 days to request a formal hearing.

Mabel, through Janice acting as her power of attorney, requested a hearing. Prior to hearing, Mabel received a written statement of facts from the Department supporting its decision. Attached to the statement were copies of relevant Department regulations, including section 120.346 (89 Ill. Adm. Code §120.346, amended at 19 Ill. Reg. 2905, eff. February 27, 1995), which applied to trusts established prior to August 11, 1993. That section provided that when an applicant's assets are held in a self-settled, discretionary trust ("Medicaid Qualifying Trust") "[t]he maximum amount of payment permitted under the terms of [the] Medicaid qualifying trust *** shall be considered in determining eligibility for medical assistance, whether or not the

maximum amount was distributed to the individual." 89 Ill. Adm. Code §120.346(b), amended at 19 Ill. Reg. 2095, eff. February 27, 1995.

The day before the hearing, Mabel's counsel faxed to the local Department office an invoice that he had prepared on Janice's behalf billing Mabel $141,960 for care received from Janice from 2000 to 2005. Counsel suggested that the invoice should be factored into the determination of Mabel's available assets.

The Department conducted the hearing on November 8, 2005. Mabel appeared through Janice and her counsel. The Department's local representative testified as to the value of trust and the Department's decision that the assets in the trust were available to Mabel, as previously outlined in the Department's statement of facts. The Department representative also addressed the invoice for Janice's services, stating that any payment to Janice would not affect Mabel's eligibility because there was no preexisting written agreement between Mabel and Janice for such payment. Absent such evidence that Mabel intended to pay Janice at the time the services were rendered, the Department would consider the services as having been rendered without expectation of payment.

Mabel's counsel argued that the trust should not be deemed available to Mabel because the trust language prohibited their consideration for purposes of determining her eligibility for public aid and forbade the trustee from making distributions that would render Mabel ineligible for public aid. As an alternative, counsel argued again that the trust should be depleted by the $141,960 that Janice was now billing her mother for the care she provided to her from 2000 to 2005.

On April 7, 2006, the Department issued a final administrative decision affirming the local office's decision to approve Mabel's application for public aid contingent on spending down the trust assets for her care. The Department upheld the local office's determination that the trust assets were available for Mabel's care, regardless of the language of the trust. It further found Janice's claim for five years of retroactive payment for her caring for her mother to be "without merit."

On May 9, 2006, Mabel, through Janice as her next friend, filed a complaint for administrative review in the circuit court seeking reversal of the Department's decision regarding both the availability of the trust assets for Mabel's care and Janice's claim for payments for past provided services. Mabel died on July 22, 2006. No motion for substitution of proper party was made.

On August 8, 2007, the circuit court issued an order affirming the Department's decision that the trust was an available asset for Ma-

bel's care but reversing its decision with respect to payment for Janice's services. The court reasoned that, although Mabel never agreed to pay Janice, Janice deserved payment under an equitable theory of *quantum meruit*. The court ordered the Department to "conform its ruling" to reflect payment from the trust to Janice. Both parties filed motions for reconsideration, and the court heard arguments on December 18, 2007.

On January 9, 2008, the court issued a final order reversing the Department's decision that the trust was an available asset. The court determined that the trust was a "Medicaid Qualifying Trust" under section 120.346 of the Department's regulations and acknowledged that the Department could consider "[t]he maximum amount of payment permitted under the terms [of the trust] *** in determining eligibility for medical assistance, whether or not the maximum amount was distributed to the individual." However, the court reasoned that, "pursuant to the specific language of the trust at issue, no amount is payable to the beneficiary if doing so would affect her eligibility for public assistance" and, therefore, "the principal and interest of the trust is exempt and should not be considered in the determination of eligibility." The court also reaffirmed its prior ruling with respect to Janice's entitlement to payment for her services.

On February 11, 2008, the Department filed its notice of appeal to this court.

On January 21, 2009, Janet filed a motion with the circuit court to substitute herself in her capacity as trustee of the Vincent Trust in the place of Mabel Vincent as plaintiff. The circuit court granted the motion that same day. The record contains no indication that the motion or the order were served upon the Department, nor does the record contain any notification to the Department.

The Department was first made aware of Mabel's death at oral argument before this court on January 26, 2009.[1]

---

[1] This court instructed the parties to file supplemental briefs addressing the jurisdictional question arising from the fact that Mabel Vincent died prior to the circuit court entering the order on appeal without a proper substitution of parties having been ordered. A party's death suspends the jurisdiction of the trial court until a proper successor has been appointed. *Voga v. Voga*, 376 Ill. App. 3d 1075, 1079-80 (2007). However, we note that this court has addressed this problem before in *Gayan v. Department of Human Services*, 342 Ill. App. 3d 1035, 1038 (2003), wherein we granted a substitution of parties pursuant to Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)) (appellate court may enter any judgment or make any order that should have been made).

## ANALYSIS

On appeal, the Department argues that the trial court erred, both in finding that trust assets were not available to Mabel for purposes of determining her eligibility for Medicaid and in reversing the Department's factual determination that the plaintiff had failed to establish the existence of a contract for Mabel to pay Janet for care.

When reviewing a decision of an administrative agency, the appellate court reviews the decision of the agency, not the decision of the circuit court. *Gayan v. Department of Human Services*, 342 Ill. App. 3d 1035, 1039 (2003). The standard of review turns on whether the issue presented is a question of fact, a question of law, or a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). Here, the Department determined that, under applicable federal Medicaid law, the trust assets were available for Mabel for purposes of determining her eligibility for medical assistance, regardless of the trust language to the contrary. The Department's decision on that matter is purely a question of law subject to *de novo* review. *Cinkus*, 228 Ill. 2d at 211 (this court reviews the Department's interpretation of Medicaid law *de novo*). The Department's determination that Janice's bill for care services had no effect on Mabel's eligibility for public aid is a mixed question of fact and law subject to the "clearly erroneous" standard of review. *Gayan*, 342 Ill. App. 3d at 1039 (the courts review the Department's application of Medicaid law to the facts for clear error). A decision is "clearly erroneous" only when the reviewing court is left with the definite and firm conviction that a mistake has been made. *Cinkus*, 228 Ill. 2d at 211. The "clearly erroneous" standard accords the agency substantial deference, in acknowledgment of the agency's experience and expertise in resolving matters under its jurisdiction. *AFM Messenger Sevice, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 394 (2001).

### 1. Availability of Trust Assets

Turning to the Department's contention that it correctly determined that the trust assets were available for Mabel's care under federal medicaid law, notwithstanding the trust language to the contrary, at issue is the meaning of provisions in the federal Medicaid Act (42 U.S.C. §1396a(k) (1988)) and section 120.346 of the Department's regulations (89 Ill. Adm. Code §120.346, amended at 19 Ill. Reg. 2905, eff. February 27, 1995). The Department interpreted both provisions as prohibiting Mabel's attempt to render herself eligible for Medicaid by sheltering assets in a self-settled trust and restricting the trustee from making any distribution that would render her ineligible

for public aid. Our review begins with a discussion of federal Medicaid law.

Congress enacted Title XIX of the Social Security Act (the Medicaid Act) (42 U.S.C. §1396 *et seq.* (2006)) in 1965 to help the indigent obtain health care. See *Gillmore v. Illinois Department of Human Services*, 218 Ill. 2d 302, 304-05 (2006). The Medicaid Act "created a cooperative program in which the federal government reimburses state governments for a portion of the costs to provide medical assistance." *Gillmore*, 218 Ill. 2d at 305. States design and administer their own plans but, in order to receive reimbursement, they "must comply with certain broad requirements imposed by federal statutes and regulations." *Gillmore*, 218 Ill. 2d at 305.

One such requirement for federal reimbursement mandates that, in order to qualify for medical assistance, an applicant must have insufficient income and resources to pay for her own medical expenses. 42 U.S.C. §§1396a(a)(10)(A)(ii), 1396d(e) (1988). Thus, the Medicaid Act expresses an intent by Congress that "[i]ndividuals are expected to deplete their own resources before obtaining assistance from the government." *Lebow v. Commissioner of the Division of Medical Assistance*, 433 Mass. 171, 172, 740 N.E.2d 978, 980 (2001).

In an attempt to circumvent the requirement that an applicant deplete his or her own resources before being eligible for public assistance, some planners devised the "Medicaid Qualifying Trust" (MQT). These MQTs operated by having a person place his or her assets in trust so that those assets would provide for the person's comfort and well-being while at the same time creating eligibility for public aid. The theory behind this instrument was that "if an individual settled assets in an irrevocable trust and the disposition of those assets was at the discretion of a trustee, no beneficiary of the trust would have a right to call for them, and so the assets could not be considered available to the beneficiary" for purposes of determining eligibility for public aid. *Cohen v. Commissioner of the Division of Medical Assistance*, 423 Mass. 399, 402-03, 688 N.E.2d 769, 771 (1996).

"Not surprisingly, Congress responded to the use of this technique with condemnation." *Ramey v. Reinertson*, 268 F.3d 955, 958 (10th Cir. 2001). In 1985, in its report recommending passage of a bill to prohibit such practices, the House Committee on Energy and Commerce wrote:

> "It has come to the attention of the Committee that some attorneys and financial advisors have suggested to the affluent clients that, as a matter of estate planning, they consider placing most of their assets into a specially designed irrevocable trust ***. The Committee feels compelled to state the obvious. Medicaid is, and always

has been, a program to provide basic health coverage to people who do not have sufficient income of resources to provide for themselves. When affluent individuals use Medicaid qualifying and similar 'techniques' to qualify for the program, they are diverting scarce Federal and State resources from low-income elderly and disabled individuals, and poor women and children. This is unacceptable to the Committee." H.R. Rep. No. 99—265, at 71-72 (1985).

In 1988, in reaction to the growing use of MQTs, Congress adopted section 1396a(k) of the Medicaid Act (42 U.S.C. §1396a(k) (1988)). The statute defined the MQT as:

"a trust, or similar legal device, established (other than by will) by an individual (or an individual's spouse) under which the individual may be the beneficiary of all or part of the payments from the trust and the distribution of such payments is determined by one or more trustees who are permitted to exercise any discretion with respect to the distribution to the individual." 42 U.S.C. §1396a(k) (1988).

Having defined MQTs, the statute then established that such devices were "no longer a permissible means to shelter assets for purposes of Medicaid eligibility." *Ramey*, 268 F.3d at 959. Rather, "the amounts from the trust deemed available to a grantor" for Medicaid purposes included "the maximum amount of payments that may be permitted under the terms of the trust to be distributed to the grantor, assuming the full exercise of discretion by the trustee or trustees for the distribution of the maximum amount to the grantor." 42 U.S.C. §1396a(k)(1) (1988). Congress further provided that the rule applies "whether or not the medicaid qualifying trust is irrevocable or is established for purposes other than to enable a grantor to qualify for medical assistance *** or *** whether or not the discretion described [above] is actually exercised." 42 U.S.C. §1396a(k)(3)(A) (1988). This provision has been interpreted as including "the maximum amount (principle or income) and interest to be deemed available to the grantor, asking what is the greatest amount the trustees in any circumstances have discretion to disburse," *i.e.*, whatever is the most the beneficiary might under any state of affairs receive in the full exercise of that discretion is the amount that is counted as available for Medicaid eligibility. *Cohen v. Commissioner of the Division of Medical Assistance*, 423 Mass. 399, 401, 668 N.E.2d 769, 777 (1996).

In the instant matter, the appellee maintains that Mabel's MQT was not covered by the statutory interpretation discussed above because in her MQT, the trustee has no discretion to make payments for the benefit of Mabel if such payments would impair her Medicaid eligibility. Mabel's argument is that because her trustee has no discretion, her MQT is not one contemplated by Congress in section 1396a(k).

The Department maintains that Mabel reads the statute far too narrowly. It points out that the intent of the statute, as articulated in the statute and in the committee comments is to remove any "techniques" involving self-settled irrevocable trusts to allow affluent individuals to maintain access to assets while at the same time qualifying for public aid. In support of its argument the Department cites several cases from other jurisdictions holding that the type of limitations imposed upon the trustee in the Vincent Trust did not shelter trust assets from the spend down requirement under the Medicaid Act. What mattered was that trust assets *could* be paid out for their benefit. See *Lebow,* 433 Mass. at 175-76, 740 N.E.2d at 982; *Cohen,* 423 Mass. at 415, 668 N.E.2d at 778; *Williams v. Kansas Department of Social & Rehabilitation Services,* 258 Kan. 167, 171-72, 899 P.2d 452, 459-60 (1995); *Striegel v. South Dakota Department of Social Services,* 515 N.W.2d 245, 248 (S.D. 1994); *National Bank of Detroit v. Department of Social Services,* 240 Mich. App. 348, 360-64, 614 N.W.2d 655, 663-64 (2000); *Hargrove v. State of Louisiana Department of Health & Hospitals,* 96—CA—1072, p.2 (La. App. 1 Cir. 3/27/97), 692 So. 2d 30, 33; *In re Kindt,* 542 N.W.2d 391, 399 (Minn. App. 1996); *Gulick v. Department of Health & Rehabilitative Services,* 615 So. 2d 192, 197 (Fla. App. 1993).

We also note that had Mabel's trust been created after August 10, 1993, there is no question that the trust assets would have to be "spent down" prior to her being eligible for public aid. In 1994, Congress repealed section 1396a(k) and replaced it with section 1396p(d), which provided that: (1) any self-settled trust assets were available regardless of whether the trustee had any discretion (42 U.S.C. §1396p(d)(2)(C) (1994)); and (2) if any of the corpus of an irrevocable trust could be used for the grantor's benefit, then all of the trust's corpus is counted as an available asset (42 U.S.C. §1396p(d)(3)(B) (1994)).

■ Reviewing this matter *de novo,* we find that the Department is correct in its determination that the clear intent of the Medicaid Act is to prevent the use of "any technique" that would allow someone to set up a MQT with the purpose of maintaining the availability of certain private assets while also qualifying for receipt of public funds. The weight of case law from other jurisdictions, as noted above, clearly supports the Department's decision which is under review herein. We therefore affirm the decision of the Department that the Vincent Trust assets are available for Mabel Vincent's care as a precondition of her eligibility for public assistance under the Medicaid Act.

## 2. Janice's Claim for Services

■ We next consider whether the Department erred in determining that Janice's invoice for past rendered services to Mabel did not

affect Mabel's eligibility for Medicaid assistance. As this issue involves a mixed question of law and fact, the clearly erroneous standard of review is appropriate. *Cinkus*, 228 Ill. 2d at 211.

The Department's decision to disregard Janice's invoice for services was not clearly erroneous. Even if Janice's invoice had been paid, which it was not, such transfers would be disregarded by the Department because there was no evidence that the transfer was for "fair market value" or "exclusively for a reason other than to qualify for assistance." 89 Ill. Adm. Code §120.387(e)(10), amended at 23 Ill. Reg. 11301, eff. August 27, 1999; 305 ILCS 5/5—2.1(a) (West 2002). Janice allegedly cared for Mabel from 2000 to 2005. The record showed that Mabel never indicated an agreement to pay Janice for her services. Then in November 2005, after the Department had determined that Mabel had to spend down the assets of the Vincent Trust to qualify for assistance, Mabel's counsel prepared a bill for services on Janice's behalf. At the time, the Trust had a value of $138,119 and the invoice, going back some five years, amounted to $141,960, which was just enough to deplete the trust. Given these facts, we cannot say that the Department's finding that the invoice was not "exclusively for a reason other than to qualify for assistance" was clearly erroneous.

## CONCLUSION

The Department properly denied Mabel Vincent's application for Medicaid. The trial court was in error in reversing the decision of the Department. The judgment of the circuit court of Henry County is reversed, and the decision of the Department is affirmed.

Circuit court reversed; Department affirmed.

SCHMIDT, J., concurs.

JUSTICE McDADE, specially concurring:

I would like to suggest a supplemental argument supporting affirming the Department's finding on the first issue that does not rely on case law from outside Illinois. The argument would be:

In enacting section 1396p(d), Congress closed a loophole in the MQT law that apparently permitted Medicaid applicants to do exactly what Mabel did here and what the new version of the law prohibits; specifically, a loophole through which applicants for Medicaid could place assets in trust then restrict the trustee's authority to distribute those assets to maintain Medicaid eligibility. This court may not now judicially close the legislative loophole under the guise of statutory

construction or interpretation of the terms of Mabel's trust. See *People v. Taylor*, 221 Ill. 2d 157, 162-63, 850 N.E.2d 134, 137 (2006) ("We cannot, under the guise of statutory interpretation, remedy an apparent legislative oversight by rewriting a statute in a way that is inconsistent with its clear and unambiguous language").

Mabel's argument implicitly relies on this principle and is, essentially, that, fortuitously for her, the Department is limited in its actions and determinations to an application of the actual language of the Medicaid Act and its administrative language and may not act based on the spirit or intent of the law. The plain language of the law applicable to Mabel's MQT restricts the Department to an examination of the trustee's authority to distribute assets. The new law permits the Department to consider those assets as available "without regard to the purpose for which the trust was established, whether the trustee has or exercises any discretion under the trust, or whether restrictions are in place regarding when or whether distributions are made." *Gayan*, 342 Ill. App. 3d at 1040, 796 N.E.2d at 661. The court has found that the new version of the MQT law is better aligned with the spirit of the Medicaid Act. See *Gayan*, 342 Ill. App. 3d at 1040, 796 N.E.2d at 661 (section 1396p(d) "is consistent with Congress's intent to strictly limit Medicaid payments to the 'truly needy.' [Citation.]").

However, our supreme court has made clear:

"[W]here a plain or literal reading of a statute produces absurd results, the literal reading should yield: 'It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. *** If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity.' [Citations.]

The principle that statutory language should not be construed to produce an absurd result is a deeply rooted one. Over 130 years ago, the United States Supreme Court interpreted a statute which, under its plain terms, made it illegal in all instances to obstruct the passage of mail or a mail carrier. The Court held that the statute did not apply to a sheriff who executed an arrest warrant against a mail carrier while he was delivering mail. In so holding, the Court cited two instances, both centuries old, where the plain language of a law was not followed because doing so produced an absurd result:

'The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "that whoever drew blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a

fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—"for he is not to be hanged because he would not stay to be burnt." ' [Citation.]

More recently, Judge Posner has explained the rule that absurd results are to be avoided, even in the face of plain language:

'Usually when a statutory provision is clear on its face the court stops there, in order to preserve language as an effective medium of communication from legislatures to courts. If judges won't defer to clear statutory language, legislators will have difficulty imparting a stable meaning to the statutes they enact. But if the clear language, when read in the context of the statute as a whole or of the commercial or other real-world (as opposed to law-world or word-world) activity that the statute is regulating, points to an unreasonable result, courts do not consider themselves bound by "plain meaning," but have recourse to other interpretive tools in an effort to make sense of the statute. [Citations.] They do not want to insult the legislature by attributing absurdities to it.' [Citation.]." *People v. Hanna*, 207 Ill. 2d 486, 498, 800 N.E.2d 1201, 1207-09 (2003).

Here, a literal reading of the applicable regulation leads to an absurd result. Specifically, a literal reading would permit Mabel to accomplish exactly that which its drafters intended to prevent. That is, the sheltering of assets to create Medicaid eligibility. To apply section 120.346 literally in this case would allow the trust to accomplish the result it seeks, to shelter Mabel's assets from any distribution that "will result in reduce [(*sic*)] public assistance," but which it plainly seeks to prevent. Under the authority granted in *Hanna*, we turn to the intent of the MQT regulation and conclude that the drafters of the Medicaid Act and the Illinois regulations intended to prevent applicants for public assistance from sheltering their own assets to qualify for public aid.

In light of the legislators' intent, and based on the record before it, I believe we must also conclude that the trust in question seeks to accomplish the prohibited result. Therefore, I believe we must agree that the assets in the trust are available to Mabel and, accordingly, are subject to the spend down provisions before Mabel qualifies for medicaid assistance.