THE COUNTY OF KENDALL, Plaintiff-Appellee, v. AURORA NATIONAL BANK TRUST NO. 1107 *et al.*, Defendants-Appellants.

Second District   No. 2—87—0720

Opinion filed June 1, 1988.—Rehearing denied June 29, 1988.

Puckett, Barnett, Larson, Mickey, Wilson & Ochsenschlager, of Aurora (Bernard K. Weiler and Joseph H. Barnett, of counsel), for appellants.

Dallas C. Ingemunson, State's Attorney, of Yorkville (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellee.

JUSTICE HOPF delivered the opinion of the court:

Defendants, Donald and Carol Hamman, are the beneficiaries of a land trust held by defendant Aurora National Bank. All of the defendants appeal from orders of the circuit court of Kendall County which temporarily and permanently enjoined them from conducting certain activities on property they own in unincorporated Kendall County. We reverse.

The parcel of land owned by defendants is zoned agricultural pursuant to the Kendall County zoning ordinance. Early in April of 1987 Donald Hamman planted sod on 90 acres of the 250-acre site at a cost of $58,900. Hamman intended to excavate a portion of the property for the asserted purpose of creating a pond from which he could irrigate the sod. Before he could begin digging, however, the county sought both a preliminary and permanent injunction restraining defendants from excavating and/or removing sand from the premises. The county's complaint alleged essentially that the Hammans planned

to mine sand on their property and that mining was prohibited in an agricultural zone.

At the hearings on the complaint, George Bell, the county zoning administrator, testified that he did not have jurisdiction over lands used to grow sod because the cultivation of sod is an agricultural use. He had never before exercised jurisdiction over a farmer digging a pond or creating a lake. Nor had he concerned himself with whether the materials removed from the ground in order to develop such ponds was sold or given away. The only reason he attempted to enforce the zoning regulations relative to the Hammans' pond was because he knew Donald Hamman owned and operated a sand and gravel mining business elsewhere in the county and Hamman had told him that he would probably sell the sand and gravel he planned to remove from the subject property. Bell was also aware that Hamman had previously applied to have the subject site rezoned from an agricultural classification to a mining classification. Pursuant to Hamman's request the application had been on hold for sometime, but it had not been withdrawn. Bell thought Hamman might be planning to mine, rather than farm, the subject site.

The county elicited further testimony from Bell that was meant to show that ponds dug by other farmers in the county had involved the extraction of clay and dirt but not gravel or sand, and that the zoning ordinance regulated extraction of the latter but not the former. On cross-examination, however, it became evident the witness did not really know what was removed from the earth for other ponds because he had never concerned himself with such excavations.

Donald Hamman's testimony indicated that he had grown up on a farm and that he and his sons now farm about 900 acres, mostly in corn and soybeans. The Hammans' acreage is situated in several different locations. At one of these locations, other than the site involved in this suit, Donald Hamman operates a commercial sand and gravel quarry. The year before the hearing Hamman's sons had persuaded him to diversify crops. As a result he planted 100 acres of sod on the site of his sand and gravel quarry. Water from the gravel pit is used to water the sod. When questioning him as an adverse witness, the State's Attorney prompted testimony from Hamman to show that he had applied for a zoning change which would allow him to also put a sand and gravel quarry on the subject site but had changed his mind when he became aware that he probably could not get his rezoning application approved. The witness denied that was the reason for changing his mind about the use of his land and indicated that he might again seek rezoning at a future time. He reiterated that he now

wished to plant sod on the subject site because of his sons' urging to diversify his farming operation. Hamman explained that the site has a subsurface of sand that goes down to 27 or 28 feet, at which point clay begins.

Much testimony was offered by witnesses from nurseries and sod farms regarding the need for irrigation for such farms, the methods used to irrigate, and the feasibility and pros and cons of the various methods. Expert testimony was offered by both parties regarding the size of the lake which would be needed to supply water for the 90 acres of sod planted by Hamman and the adequacy of the lake proposed by the defendants.

Following the first hearing the court entered an order temporarily restraining defendants from excavating or removing sand from the site. In the order the court found that the Hammans were planning to engage in mining activities in an agricultural zone and thus were in violation of the county zoning ordinance. Subsequently, a permanent injunction issued which set forth the same findings and restraints as had been recited in the temporary order. Both injunction orders were preceded by letter opinions from the trial judge in which he enunciated the following reasons for his conclusion that the Hammans were mining their property rather than farming it: (1) Donald Hamman already operated a sand and gravel operation at another location in Kendall County; (2) Hamman had previously submitted and never withdrawn an application for a zoning change which would allow the mining of sand and gravel on the subject property; (3) construction of the pond would require removal of 2½ feet to 3 feet of topsoil and 24 feet to 25 feet of sand; (4) Hamman intended to remove the sand from the subject site and probably would sell it commercially; (5) the pond proposed by defendant would be inadequate for the purpose of watering sod. The court concluded:

> "The above facts indicate to the Court that the Defendant would not be making an economic or business decision after digging a pond to provide water for sod but was, in fact, intending to mine sand and gravel."

Subsequent to entry of the permanent injunction defendants filed this timely appeal.

It is not contested that defendants intend to excavate and remove sand and gravel from their site. Defendants argue, however, that their goal in such excavation is to create a pond to serve as a source of irrigation for the sod they have already planted. Creation of such a pond, defendants insist, is an agricultural use of the land which is exempt from county regulations. The county does not dispute that agri-

cultural land uses are exempt from county regulation, or that generally the creation of a pond for watering sod is an agricultural use, or that the Hammans' activities on their property will result in a pond. Plaintiff is, however, adamant that the primary purpose of the excavation planned by the Hammans is not to construct an irrigation pond but rather to remove sand and gravel from the site as part of a mining operation. The pond is perceived by plaintiff as merely an incidental effect of mining activity. In fact, the entire sod operation is viewed by plaintiff as secondary to defendants' mining business. There is no disagreement that generally the mining of sand and gravel may be regulated by the county. Plaintiff concludes that since creation of the pond is a mining use of the property, it is subject to the county zoning regulations. After carefully reviewing the facts of this case and the controlling law, we are persuaded that defendant must prevail.

■■ It is well established that agricultural land uses are controlled by the statutory provisions for county zoning (Ill. Rev. Stat. 1985, ch. 34, par. 3151) rather than by the county zoning ordinance. Section 1 of "An Act in relation to county zoning" indicates that a county may not exercise its zoning powers "so as to impose regulations or require permits with respect to land used or to be used for agricultural purposes *** or with respect to *** structures used or to be used for agricultural purposes upon such land except that *** structures for agricultural purposes may be required to conform to building or set back lines." (Ill. Rev. Stat. 1985, ch. 34, par. 3151.) Accordingly, other than setback lines, a county may not regulate land used for agricultural purposes. Thus, if the Hammans are pursuing an agricultural purpose, as they insist they are, the county may not restrict their activities, and the injunction must be dissolved. The issue in this case, then, is not whether the Hammans intend to mine the sand and gravel from their land, as the county would have us believe, but whether the excavation of sand and gravel in this particular instance constitutes use of the land for an agricultural purpose. We think it does.

■■ That the Hammans' pond-building project necessarily involves certain activities which appear to be more characteristic of a sand and gravel mining operation than of farming is not determinative of the issue before us. In deciding if a challenged use is for an agricultural purpose the courts have not concerned themselves with the property owners' business activities or ultimate business objectives. Rather, the courts have focused on the nature of the specific activity in light of the definition of agriculture. We recognized and followed this approach in *Tuftee v. County of Kane* (1979), 76 Ill. App. 3d 128, 394 N.E.2d 896. The county in *Tuftee* attempted to restrain plaintiff from

using her property to board and train show horses on grounds that such activities did not constitute an agricultural purpose. We examined the definition of "agricultural purpose" which had been set forth in *People ex rel. Pletcher v. City of Joliet* (1926), 321 Ill. 385, 152 N.E. 159, and was based on Webster's definition of the word "agriculture." According to the *City of Joliet* court:

> " 'Agriculture' is defined as the 'art or science of cultivating the ground, including harvesting of crops and rearing and management of livestock; tillage; husbandry; farming; in a broader sense, the science and art of the production of plants and animals useful to man, including to a variable extent the preparation of these products for man's use. In this broad use it includes farming, horticulture and forestry, together with such subjects as butter and cheese making, sugar making, etc.' Unless restricted by the context, the words 'agricultural purposes' have generally been given this comprehensive meaning by the courts of the country." (*City of Joliet*, 321 Ill. App. at 388-89.)

In light of this definition we found that the feeding, training, and boarding of horses fell within the scope of the agricultural purpose of "rearing and management of livestock." We indicated that the purpose for which horses are raised should have no bearing on whether the activities involved in raising them constitutes "rearing and management of livestock."

In *Tuftee*, we also analyzed *County of Grundy v. Soil Enrichment Materials Corp.* (1973), 9 Ill. App. 3d 746, 292 N.E.2d 755 (*Soil Enrichment* I), and a companion case, *Soil Enrichment Materials Corp. v. Zoning Board of Appeals* (1973), 15 Ill. App. 3d 432, 304 N.E.2d 521 (*Soil Enrichment* II). Both cases explored the scope of an "agricultural purpose." In *Soil Enrichment* I the county sought unsuccessfully to enjoin the spreading of sludge on farmland on the basis that the defendant was primarily in the business of contractual sludge disposal. Therefore, the county argued, defendant was not engaged in agriculture. In *Soil Enrichment* II the court refused to enjoin construction of a holding pit for storage of the digested sludge. In neither case was the court persuaded by the argument that the soil company's principal activities were not agricultural in nature. Rather, the court's inquiry was limited to the precise conduct being challenged. In *Soil Enrichment* I the spreading of sludge accomplished the fertilization of the land. In *Soil Enrichment* II the sludge that was stored ultimately became fertilizer. It is clear in the opinions that the court considered fertilizer and fertilization to be integral and beneficial aspects of agriculture. Therefore, it did not matter that the soil compa-

ny's primary objective was not agricultural. As stated by the *Soil Enrichment* I court: "The issue is not what appellant's main business interest is but solely whether or not the application and use of digested sludge on farm lands is serving an agricultural purpose." *County of Grundy*, 9 Ill. App. 3d at 753.

In *Soil Enrichment* II the court looked upon storage of the sludge as one part of a broader process. In the court's words: "[I]f the spreading of digested sludge on farmland is in itself a use for an agricultural purpose, then the use of land to accommodate the immediate and necessary facilities by which sludge is transported to such farmlands is also for an agricultural purpose." (*Soil Enrichment Materials Corp.*, 15 Ill. App. 3d at 434.) In sum, the cases teach that whether an activity involving use of the land has an agricultural purpose is to be determined from the activity itself and not from such external considerations as the property owner's intent or other business activities.

■ Applying the principles of *Tuftee* and the *Soil Enrichment* cases to the matter at hand, we find that the conduct challenged by the county constitutes use of the land for an agricultural purpose. It is undisputed that the Hammans have already planted sod on 90 acres of the subject property. The testimony from witnesses for both parties is totally consistent that, while sod will grow with only natural rainfall for irrigation, a supplementary water supply is essential for the optimum growth necessary to a financially sound sod farm. Wells, ponds, lakes, rivers, and other streams, or any combination thereof, are used by sod growers for supplemental water. Apparently none of these water sources presently exists on the Hamman property. Donald Hamman testified that the pond he intended to create would be 7 to 10 acres in size.

On these facts we have no doubt that the water from the pond contemplated by defendants will serve as a supplementary water supply for the sod planted on defendants' property. As an essential part of the process of sod farming, the provision of supplemental water certainly falls within the scope of the *City of Joliet* definition of "agriculture" in that it is a necessary part of the "art or science of cultivating the ground" and of "the science and art of the production of plants and animals useful to man." (*City of Joliet*, 321 Ill. at 388.) Not unlike the storage pit for the sludge in *Soil Enrichment* II, the pond here will collect and store water until it is needed to irrigate defendants' sod. The storage of water, then, is just one facet of the broader cultivation process. It follows that creation of the pond for storage, including the necessary excavation of sand and gravel, is still another facet of that process. As such, even the removal of sand and

gravel has an agricultural purpose and is beyond the county's zoning powers.

As we mentioned earlier the county does not dispute that cultivating sod or providing an irrigation pond for sod is an agricultural use. Instead, the plaintiff asks us to focus on defendants' intent and attempts to persuade us that defendants are creating the pond primarily for its value as a sand and gravel quarry and that its irrigation function will be carried on only to facilitate the quarry operation. We acknowledge the potential for the problem the county apparently envisions in a case like this. The precise activity we focus on is the removal of sand and gravel from defendants' property. Obviously, some sand and gravel must be taken out in order to create an adequate irrigation pond. However, extraction of great amounts of material could result in creation of a quarry, or pit, of the type associated with gravel mining, with the irrigation pond located at the bottom. Alternatively, sand and gravel could be removed to the extent that the acreage of the lake would be far greater than the acreage planted in sod. Either of these scenarios could effectively change the basic agricultural character of the sod operation while still retaining the pond for irrigation purposes. The question is, at what point, if ever, does excavation which results in an irrigation pond cease to constitute a use of the land for an agricultural purpose as that phrase is used in the statute? We believe, first of all, that such excavation can lose its protected status.

The statute exempts land used for agricultural purposes from the effect of the county zoning regulations. The language of the statute makes it quite clear that land used for agricultural purposes is the *only* land covered by the exemption. In the case at bar there is the potential for a *de facto* quarry operation to be carried on in violation of the Kendall County zoning ordinance. If defendants did start quarrying their land and the agricultural purpose exemption was found to be applicable, the county would be powerless to stop the improper use. To enforce the exemption under such circumstances would be to frustrate the obvious intent of the legislature to allow agriculture, and only agriculture, to be pursued without zoning restrictions. To hold otherwise would be to allow the statutory exemption to be manipulated and twisted into a protection for virtually any use of the land as long as some agricultural activity was maintained on the property. The county's zoning power would thus be rendered meaningless. The legislature cannot have intended such a result when it created a protected status for land used for agricultural purposes.

The question of when a use for an agricultural purpose no longer

warrants the protection of the statute will depend on the facts of each case. Here, the Hammans planted 90 acres, or more than one-third of their property, in sod at a cost close to $60,000. The county did not show that 90 acres is insufficient for a successful sod farming operation. On the contrary, several witnesses testified that they grow sod commercially on similar acreage. The county attempted to show that a pond is not needed on the subject site since a well would be the more efficient and dependable and usual water source for the defendants to install for the benefit of their sod. But the evidence also indicated that ponds are used, both alone and in combination with other water sources, by Illinois sod farmers and that it would be considerably more economical for the Hammans to dig a pond than to install a well.

Conflicting expert testimony was offered as to the adequacy of the proposed pond for irrigating 90 acres of sod. Cross-examination, however, revealed that both parties based their calculations on the same 1979 soil borings and that both calculations suffered from similar weaknesses. Donald Hamman testified, and it was not disputed, that a seven- to eight-acre pond had been sufficient to water 100 acres of sod he had planted the previous fall in another location in Kendall County. He had no well on that site. The pond envisioned by Hamman for the subject site would be 7 to 10 acres in size or approximately one–twenty-fifth of the total site.

The evidence presented in this case persuades us that the pond the Hammans wish to dig will be used for agricultural purposes to an extent which brings their property within the exemption created by the statute. We are well aware that the use of the land is subject to change depending on what the defendants do on the site. Based on the evidence presented by the parties at the injunction hearings, however, the pond need not be constructed in such a way as to change the basic agricultural nature of the present use of the land. We note in this regard Donald Hamman's testimony that he will dig an auxiliary well if it becomes necessary.

Since the excavation to be undertaken by the Hammans serves an agricultural purpose, we need look no further into their intent, or any of their other business activities, or their ultimate business objective. Despite the county's urging to the contrary, under the *Soil Enrichment* cases, as well as *Tuftee*, it does not matter that the pond excavation may resemble in some ways defendants' existing sand and gravel quarry operation or that defendants applied for rezoning to a mining classification. Nor does it matter whether defendants removed sand and gravel from their site as opposed to clay and dirt. Equally irrele-

vant is what defendants do with the sand and other materials they remove from the site. We believe the trial court was mistakenly persuaded to focus on the factors just listed rather than on whether or not defendants wish to use their land for an agricultural purpose.

In light of our determination that the proposed use of their land is for an agricultural purpose, we need not discuss the other issues raised by defendants. For the reasons set forth above, the order of the circuit court of Kendall County enjoining defendants from excavating and/or removing sand from their property is reversed, and this cause is remanded with direction to vacate said injunction.

Reversed and remanded with direction.

LINDBERG, P.J., and DUNN, J., concur.