2025 IL App (2d) 240452-U
No. 2-24-0452
Order filed June 5, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| DEEP CREEK RANCH, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-MR-21 |
| | ) | |
| LAKE COUNTY ZONING | ) | |
| BOARD OF APPEALS, GREGORY | ) | |
| G. KOEPPEN, in his official capacity as | ) | |
| Chair of the Lake County Zoning | ) | |
| Board of Appeals, ERIC WAGGONER, | ) | |
| in his official capacity as Director of the | ) | |
| Lake County Planning Building | ) | |
| and Development Department, | ) | |
| SUSAN PRIBYL, CLAUDIA TURK, | ) | |
| DIANA O'KELLY, and DONNA LYNN | ) | |
| CARINGELLO, | ) | Honorable |
| | ) | Charles W. Smith, |
| Defendants-Appellants. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The Zoning Board of Appeals did not err in denying plaintiff's appeal of a zoning and permit determination, where it properly rejected plaintiff's interpretation of an agricultural exemption to permit requirements. We reverse the circuit court and affirm the Board.

¶ 2 Plaintiff, Deep Creek Ranch, LLC, filed a complaint in the circuit court seeking administrative review of a decision issued by defendant, the Lake County Zoning Board of Appeals (the Board), upholding a zoning and permit interpretation rendered by defendant, Eric Waggoner, Director of the Lake County Planning, Building and Development Department (hereinafter, the Director and Department, respectively).[1] The circuit court reversed the Board's decision. For the following reasons, we reverse the circuit court and affirm the Board.

¶ 3                                I. BACKGROUND

¶ 4                    A. Application for Site Development Permit

¶ 5 Plaintiff owns a 47-acre property in unincorporated Fremont Township. The property is located at the intersection of Peterson Road and Route 60 and is in an agricultural zoning district in unincorporated Lake County. It is bordered by Manitou Creek and has, since 1939, been farmed agricultural land (row crops, most recently corn).

¶ 6 On September 29, 2022, plaintiff submitted a permit application to the Department for a proposed site development project on the property; namely, an equestrian facility to include a stable, a barn, an arena, pastures, and related facilities.

¶ 7 A Department planning and zoning manager denied the application. The manager agreed that the proposed concept of an equestrian facility with associated barns and a riding arena would constitute a permitted agricultural use and would qualify for "agriculture exemption." However, the manager explained that the proposed "40 acres of site disturbance and related 10-12 feet of fill

_____

[1]Plaintiff sued Gregory G. Koeppen, the Board's chairperson, in his official capacity. Further, plaintiff sued Susan Pribyl, Claudia Turk, Diana O'Kelly, and Donna Lynn Caringello as defendants in name only and sought no relief against them.

across the entirety of the property *is not an agricultural activity*, nor is it a *necessary* component of the [agricultural] exempt equestrian use." (Emphasis added.) Rather, that activity would be considered a separate use and as "Warehousing & Freight Movement, which is defined as the storage and movement of materials." As warehousing and freight movement was not permitted in an agricultural zoning district, such activity would require a rezoning of the property.

¶ 8                    B. Zoning Determination Application

¶ 9    On February 1, 2023, plaintiff requested a zoning determination from the Director. In its written request, plaintiff explained that its proposed development of the property for an equestrian facility with pastures would be a recognized agricultural use. Further, plaintiff disagreed that the proposed filling and grading was not a necessary component of the agricultural use. It asserted that, to use the property for an equestrian facility, the proposed filling and grading was "required" and "essential" for four overarching reasons, namely, to address: (1) surface drainage, (2) erosion, (3) visibility and attractiveness, and (4) safety. Accordingly, plaintiff claimed that the proposed filling and grading was "essential" to the equestrian use and, moreover, that categorization of the activity as warehouse and freight movement, requiring rezoning, was incorrect, as the fill placed on the site would facilitate development of an agricultural use and would not be stored for later movement or sale to a consumer. "We request an interpretation that the equestrian facility proposed is an agricultural use and the filling and grading *necessary* for the equestrian facility is not a separate use." (Emphasis added).

¶ 10    On April 10, 2023, the Director responded to plaintiff's request for a zoning determination. The Director's decision first described the property and noted that it contained three depressional areas that may be considered floodplains and contain wetlands. The site drained towards Manitou Creek to the northwest. According to the project plan, prepared on September 5, 2022, by Rooney

Consultants, Inc., plaintiff proposed filling with imported material approximately 27 acres of the site, grading the fill material, and then constructing the equestrian site on top of the resulting fill pad. The imported fill would range between 13 and 20 feet in depth and would taper down to existing grade at the perimeter and approximately 150 feet from the creek.

> "Overall, the proposed fill area, spread over a distance of roughly 1000 feet south to north, encompasses over half of the site and will result in a continual overland longitudinal slope of approximately 1% *** towards Manitou Creek. Based on the proposed site plans provided, the amount of fill material to be imported and placed on site consists of approximately 616,043 cubic yards (51,337 dump truck loads, based upon an average volume of 12 cubic yards per dump truck)."

¶ 11   As such, the Director first addressed whether the proposed equestrian facility would constitute permitted agricultural use. After providing definitions from the Unified Development Ordinance of Lake County, Illinois ("UDO") (Lake County Code of Ordinances § 151/001 *et seq.* (adopted Oct. 13, 2009)), he answered that question affirmatively, agreeing that the proposed equestrian facility would be a permitted use on the agriculturally-zoned property.

¶ 12   Next, however, the Director addressed whether the proposed fill and grading operation prior to the establishment of the equestrian facility structures and spaces constituted a necessary component of the equestrian facility, or if, instead, it would be a separately classified use. Ultimately, the Director disagreed with plaintiff's position that, for four reasons, importing fill to elevate the final grade of the site between 13 to 20 feet was a necessary component of the proposed equestrian facility. In sum, first, as to surface drainage, he responded that alternative measures exist to address poor drainage and hysteric soils that are less impactful and better aligned with agricultural industry best practices. Further, "importation of 616,043 cubic yards of material is

*wholly unnecessary* to address any challenges of establishing a pasture on this property; between best-practice-based levels of drain-tile work and/or avoidance of or minimization of grazing in such areas, a majority of the site can be used effectively for pasturage with minimal concerns for vegetative growth and grazing injury." (Emphasis added.)

¶ 13    Second, as to erosion, the Director determined that areas of high velocity flow were not present on the site, the existing depressions serve to hold water and reduce stormwater runoff, pasture grasses would ultimately reduce additional stormwater runoff, and a uniform slope could be established using more limited amounts of fill in particular areas. In addition, rather than reducing erosion, the Director noted that the addition of 616,043 cubic years of fill was *not necessary* and "compaction to the degree envisioned by the importation of (on average) between 13 and 20 feet of fill material, especially in light of the clay-dominated composition of fill material available *** could *impede* natural water infiltration across the surface of the finished fill pad below the depth of any top-dressed topsoil, thereby *increasing* the risk of surface flooding and runoff in a major storm event." (Emphases added.)

¶ 14    Third, in response to plaintiff's justification that the proposed fill was necessary for visibility and attractiveness, the Director responded that "[a]esthetics of a site are subjective and not a *necessary* component of agricultural activity." (Emphasis added.)

¶ 15    Fourth, regarding safety concerns that exiting the site with a truck and horse trailer was a safety issue at existing site grades because visibility of the existing highway from locations 6 or 10 feet below grade was severely compromised, the Director explained that some limited filling and grading might be needed and appropriate for the access point to the site, *i.e.*, an entrance drive. "However, the addition of 616,043 cubic yards of fill material across the entire site is a disproportionate solution to address this issue." He noted that, although the final site plan did not

identify an entrance or driveway, presumably a driveway and ingress/egress point could be constructed utilizing minimal amounts of fill in a precise and targeted manner and location.

¶ 16　The Director next noted that, in addition to analyzing plaintiff's justifications for the fill and grade as a "necessary component" of the equestrian facility, he and his staff considered the nature and characteristics of the fill activity itself. He calculated that delivering the proposed amount of fill would require the arrival of multiple dump trucks every hour for eight hours, five days per week, for around five or six *years*. This length of time far exceeded customary site preparation development activity, for which permits usually expire after two years. As such, the degree of hauling and grading proposed was more consistent with the UDO's definition of warehouse and freight movement than the customary ancillary site preparation necessary for an equestrian facility.[2]

¶ 17　In sum, the Director explained that, based on the information plaintiff submitted, it was the Department's position that, while the "future equestrian facility *itself* is classified as a permitted agricultural use, the proposed fill/grade activity does not align with equestrian industry best practice nor is it a *necessary* component to the establishment of an equestrian center use." (Emphases added.) Rather, he explained, according to the UDO, the import and grading of large quantities of fill material was more similar to, and more appropriately classified as, warehouse and

---

[2]The Director noted that plaintiff was created one day prior to its purchase of the property and the manager, Kyle Kanzler, owned and operated Kanzler Construction, which specializes in hauling, excavation, and mass grading contractor work. The mass hauling and grading proposed was more consistent with Kanzler Construction's ordinary course of business than site prep activity customarily accessory to the establishment of an equestrian facility.

freight movement. Since such movement is not permitted in an agricultural zoning district, the proposed hauling and grading activity was not permitted on the property.

¶ 18                                C. Zoning Board of Appeals

¶ 19    On May 15, 2023, plaintiff appealed the Director's decision to the Board. In its application for administrative appeal, plaintiff explained that its proposals would make the property more level, "more conducive for the proposed agricultural use," more consistent with the adjacent roadway, and less vulnerable to soil erosion from stormwater runoff. In addition, in a position it had not originally presented to the Director in its zoning determination application, plaintiff argued that the UDO deprived Lake County of any basis for regulating filling and grading involved in agricultural practices, so long as that grading and filling did not take place in a regulatory floodplain. Specifically, plaintiff referenced section 151.145(C)(3)(c) of the UDO, which provided that a site development permit shall not be required for:

> "(c) Agricultural practices outside of the regulatory floodplain that involve filling or grading, including but not limited to the construction of levees, terraces, and surface water diversions that are a part of a Natural Resource Conservation Service designed and approved construction project." Lake County Code of Ordinances § 151.145(C)(3)(c) (adopted Aug. 9, 2022).

Here, plaintiff asserted, since the proposed filling and grading would not take place in a floodplain, it was *exempt* from needing a site development permit from the County. Plaintiff noted that the exemption did not contain any qualifications on the amount of filling and grading activity involved in agricultural practices, nor whether the filling and grading was a "best practice" for the agricultural activity. "Therefore, there is no basis for the Department to assert the [C]ounty is entitled to regulate filling and grading associated with an agricultural use simply because it has

subjectively determined such filling and grading is not the 'best practice' for such use." Further, plaintiff argued that classification of the fill as warehousing and freight movement was inaccurate and an absurd result, in which it would be forced to apply for rezoning of its property to develop a *permitted* agricultural use in an agricultural area. Plaintiff argued that the Department erred in separating the *manner* in which the facility would be constructed from the agricultural use that was permitted.

¶ 20 The Department, represented by the Lake County State's Attorney's Office, responded, in sum, that the Director's zoning interpretation should be upheld, noting that, according to section 151.058(G) of the UDO, the Board "shall grant the administrative official's decision a presumption of correctness, placing the burden of persuasion of error on the appellant." Lake County Code of Ordinances § 151.058(G) (adopted Oct. 13, 2009). It asserted that the extent of fill and grading proposed was outside the scope of what is considered permitted site development, as site development permits are valid for two years and the proposed fill here would, even on a vigorous schedule, take an estimated six years to haul onto the site. Further, the Department noted that, while some fill might be required, the facts did not support a need for 616,043 cubic yards of fill for an equestrian facility. In addition, the Department disputed plaintiff's assertion that no filling would occur in a regulatory floodplain, as plaintiff's plans proposed to fill depressional areas that were likely floodplains and not exempt from site development permitting. Moreover, the Department disagreed with plaintiff's reading of the permit exemption, explaining that the interpretation was inconsistent with the rest of the ordinance and not supported by statutory interpretation principles. According to the Department, section 151.145(C)(3)(c) provided that a site development permit was not required for agricultural practices (outside of the regulatory floodplain) that involve filling or grading that will *instead* be permitted and approved by the

Natural Resource Conservation Service, which plaintiff did not assert was the case here. Further, it noted, plaintiff's interpretation was inconsistent with other subsections of the exemption provisions.

¶ 21    The Board held public hearings on September 18 and 21, 2023; October 23, 2023; and December 7, 2023. The Board accepted public comment, reviewed the parties' briefs and other submissions, and considered evidence, testimony, and oral argument from the hearings.

¶ 22    Witnesses for plaintiff included: (1) Mark Rooney, a licensed engineer with more than 40 years of experience and one of plaintiff's members; and (2) Michael Forti, who runs an equestrian center. In sum, Rooney, an expert in civil and environmental consulting, testified as an expert that he developed the site plan for the equestrian center. In response to the Director's expressed concern that plaintiff would fill depressional areas that constituted regulatory floodplains, Rooney had modified the plan, such that the "new" plan would require 428,000 cubic yards of fill and no filling or grading would occur in a floodplain. He identified and explained the four goals to be addressed by fill and grading. First, Rooney testified that surface drainage was an issue, because the property contained flat and/or depressed areas that did not properly drain or resulted in soft soils detrimental to horse pasture. Second, he explained that the current 2% to 5% slope of the property tended to lend itself to erosion, so grading the fill to a 1% uniform slope would allow the water to absorb into the ground and not run off. Third, as to visibility and attractiveness, he testified that the property sat below the abutting highway and "I mean you don't want to build it down in a hole." Fourth, regarding safety for trucks and trailers accessing the property, Rooney opined that it was not safe for the site to be 8 to 10 feet below the roadway. Rooney testified that any material coming to the site would stay there permanently, and he did not believe that truck traffic to the site for the filling process would disrupt the area. He believed it would be "hardly

noticeable." Rooney agreed that the proposal included a *conceptual* equestrian center, in the form of a document he pulled off the internet, not an actual rendering. He agreed that: drain tiles exist on the site and could be used for drainage; elevating the property to meet the road would be for aesthetic, not agricultural, reasons; and the fill would consist of clay material. The proposed process would entail topsoil being removed, fill would be deposited and compacted by bulldozers, and then topsoil would be reapplied over the clay to allow growth of grasses. Because the average dump truck hauling fill would hold 12 to 16 cubic yards of clay, and Rooney would like 428,000 cubic yards to achieve plaintiff's goals, bringing in a truck every 10 minutes at 48 trucks per day, for 5 days per week, would take approximately 2.85 years to haul in the fill. Rooney agreed that plaintiff would be paid to bring in the fill, and that, if he did not have an excavator for a partner, he would not develop the site.

¶ 23    Forti testified that, for 24 years, he has operated a horse farm in McHenry County and had been consulting plaintiff for one month. His property has a 1% slope, which he believes customers seek, and plaintiff's property is not suitable for an equestrian center, which he explained should have a clay base with six inches of topsoil. Forti is not an engineer, was not involved in the site selection, and did not calculate the amount of fill that plaintiff had proposed. He testified that the areas designed for pasture would require filling and grading.

¶ 24    The County's witnesses included: (1) Brian Frank, chief engineer for the Lake County Stormwater Management Commission; and (2) Director Waggoner. Frank testified that he previously worked for the Department as principal review engineer and is experienced in reviewing site development plans and in regulating stormwater flow. He had not visited the site, but he reviewed plaintiff's submitted plans, which he described as incomplete. Frank testified that the plans might worsen drainage, as they sought to create a 1% slope over the property, which he

described as "quite flat." Further, he explained that plaintiff's plan would likely produce a "slight increase in runoff," as fill material is composed of clay which, when compacted, reduces infiltration and increases runoff (*i.e.*, more potential erosion) and "ponding." In contrast, and although a 1% slope with infiltration results in less water going into the creek, the property's existing 2% to 5% slope facilitates drainage without much velocity. Frank testified that the property has existing drain tiles that could be cleaned and/or repaired, which would address alleged erosion issues. Frank testified that the amount of fill proposed served no stormwater purpose and that the site could be "balanced" without "10 feet of fill" across it.

¶ 25    The Director testified that he is responsible for interpreting the UDO. He testified largely consistent with his previous findings and decision, and he elaborated on his research and the investigative process that formed his ultimate opinion. The Director further noted that the plans plaintiff presented to the Board had been modified, but they did not alter his decision. He noted that he had personally visited the site, and there were no visibility problems, although he agreed that some fill in limited areas could be necessary for safe ingress and egress. The Director explained that the modified plan, seeking 428,000 cubic yards of fill, equated to approximately 36,000 truckloads, and that the amount of truck deliveries, throughout the day for several years, was not characteristic with a typical equestrian facility. He maintained that the amount of fill and grading activity was not necessary for the agricultural use.

¶ 26    Plaintiff's counsel's cross-examination of the Director included the following exchanges:

> "COUNSEL: Would you agree with me that any agricultural practice that involves filling and grading, typically the filling and grading would precede the agricultural use, lead to the agricultural use?
>
> DIRECTOR: Customarily, yes.

COUNSEL: And what's proposed here—I know you disagree with it—but what's proposed here is just that; that the building and grading will proceed to and lead to and result in the agricultural use, correct?

DIRECTOR: That's correct.

COUNSEL: And there is nothing in that exception that quantifies the amount of filling and grading or caps the amount of filling and grading that can be done pursuant to the final use which would be an agricultural use, correct?

DIRECTOR: That's correct.

COUNSEL: And so what you've done is that you have imposed your judgment to determine that amount matters, right?

DIRECTOR: Yes.

COUNSEL: Regardless of what this language is, that there really is an unstated cap or limit on the amount of filling and grading that will be allowed incident to the final use which is an agricultural use, correct?

DIRECTOR: I don't believe it's incidental to the final use.

COUNSEL: You have also stated, testified, that there is no cap or limit on the amount of filling and grading under this exception?

DIRECTOR: That is correct.

COUNSEL: But what you've done here and in your determination is you have really injected a limit or a cap on the amount of filling and grading that will be allowed, right?

DIRECTOR: Correct.

COUNSEL: And if a property owner who purchases a piece of property for agricultural purposes, practices, like an equestrian facility, looks at a regulation and also looks at their property and says my property is going to involve some filling and grading before I can achieve my agricultural use, what they'll never know is what that limit or cap on the amount of filling and grading that will be allowed, correct?

DIRECTOR: Unless they ask.

COUNSEL: Unless they ask. So what you're saying is anybody who reads this— a citizen, a property owner, who buys a piece of property—would have to know, couldn't just rely on what they read, they would have to come and ask you; correct?

DIRECTOR: This department is responsible for –

COUNSEL: Yes or no, sir?

DIRECTOR: Yes."

¶ 27 In addition, plaintiff's counsel questioned the Director about the end use being agricultural,

"DIRECTOR: I determined that the end use *on top of* the fill/grade is an agricultural use.

COUNSEL: Better stated, thank you. Okay. And you knew when you made that determination that the only way that that final use could be achieved is with filling and grading on the property to the extent proposed, correct? Couldn't be done any other way?

DIRECTOR: I made—I took the position that an ag[ricultural] use on this property, an equestrian facility, *could* be accommodated in other ways." (Emphases added.)

¶ 28 In argument, plaintiff's counsel impressed upon the Board the meaning of the word "involve" in section 151.145(C)(3)(c)'s exemption:

"The operative word there is 'involved.' There is no limit on the amount of filling and grading in that definition, nor anywhere else in the UDO, and the words 'filling and grading'—and I used the Oxford Dictionary; I looked up any number of dictionary definitions—it's a word I would say we all use commonly, often, the word 'involve.' The word 'involve' means *necessary* part. So if I were to, just by way of example, say agricultural practices outside of the regulatory floodplain, that involve filling or grading. That's what involve is; were *a necessary part*." (Emphases added.)

¶ 29    On December 7, 2023, the Board unanimously affirmed the Director's decision, finding that plaintiff did not sustain its burden to persuade the Board that the decision was in error. A few Board members expressed doubt that plaintiff intended to use the property for an equestrian center, given the lack of specific business and building plans and because the amount of fill did not seem to be an essential part of the agricultural use. The Board determined that, although the proposed equestrian facility was a permitted agricultural use, the interim filling and grading activity is more appropriately classified as warehouse and freight movement, is not a permitted use in the agricultural zoning district, and is not permitted on the subject property without rezoning. Further, it found "unacceptable" plaintiff's claim that the filling and grading requested for the equestrian use fell within that UDO's exemption.

¶ 30    The Board noted that Rooney based his design and plan for the equestrian center around four concerns: surface drainage, erosion, visibility and attractiveness, and safety. As to surface drainage, however, the Board found that, despite Rooney's experience, he disregarded that Lake County is part of the Stormwater Management Commission community, which requires a site development permit for projects that involve grading and filling activities, as well as for any development in the floodplains and wetlands or projects that may result in soil erosion. Indeed, a

site development permit is generally *required* for projects: (1) with grading, filling, and site restoration; (2) exceeding 1,000 square feet of ground projects that exceed 5,000 square feet of ground disturbance; and (3) that would alter the existing grade by more than three feet in vertical height, and plaintiff's proposal involved all three of the aforementioned activities.

¶ 31    With respect to erosion, the Board found, based on the Director's discussion with soil experts, as well as testimony by Forti, that a 1% grade would cause drainage to worsen. Further, the Board found, Frank had also explained that grading should be between 2%-5%, the property's current slope, and that the proposed compacted clay fill would worsen the erosion and drainage for a pasture.

¶ 32    The Board was not convinced by plaintiff's arguments concerning visibility and attractiveness, finding: (1) no business plan or serious architectural renderings were presented, and Rooney testified he pulled his drawing for the barn from the internet; (2) Rooney testified the elevation preference was "simply because he saw another building built up high and it looked nice;" and (3) Rooney testified that there was no agricultural purpose for visibility and attractiveness and, therefore, the Board concluded, "there is no *need* for so much fill." (Emphasis added.). The Board agreed with the Director that "the need for 428,000-600,000 cubic feet amount of fill requested is not an essential part of the agricultural use." The amount would exceed the site development permitting deadline, as it would take more than two years to deliver and grade the proposed fill material, and the amount is more consistent with the warehousing and freight zoning classification.

¶ 33    Finally, regarding safety, the Board found that plaintiff did not address any vehicular access or provide any documents from the department of transportation. Further, the Director's testimony demonstrated that no visibility or access issues currently exist. Although Rooney testified that the

number of trucks would be insignificant, "he is not a traffic engineer" and "[i]n fact, the excessive numbers of trucks needed to transport all this fill could create a safety issue in and of itself."

¶ 34                                                    D. Circuit Court Appeal

¶ 35    On January 25, 2024, plaintiff, pursuant to the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2022)), appealed to the circuit court.  The court construed section 151.145(C)(3)(c) of the UDO *de novo* and determined that plaintiff was not required to seek a site development permit.  The court found an absence of legal authority allowing the Director to limit the amount of fill plaintiff could deposit on property zoned agricultural, when an equestrian center had been determined to be a permitted use in the agricultural zone.   It also found that the County had been aware of the "alleged ambiguity" in section 151.145(C)(3)(c) for a significant period. The court referenced the Director's testimony acknowledging that "there is no standard in the UDO for a land-owner to know when the amount of fill in the [agricultural] zoned property was going to require a site permit for development."  It noted that requiring rezoning would be cumbersome and expensive, and plaintiff's likelihood of success in obtaining rezoning would be "highly negligible."  The court determined that, "[w]hile the Director is granted significant authority under the UDO, the direct zoning issues and classifications, there must be some standards in this regard, and the landowner must be told what he can or cannot do with his property."  It continued that a landowner cannot know and must speculate as to when a site development permit is or is not necessary, and leaving the issue solely in the hands of the Director to decide on a case-by-case basis was not consistent with the concept of due process applicable to the Board and its hearings. The court closed by noting,

> "While this Court has grave reservations as to plaintiff's intended use of the
> property in question, it has no hard evidence that the plaintiff intends to use the parcel

strictly as a landfill for excavated construction projects as the County suspects. Plaintiff's presentation as to its equestrian operation has no site plan, no showing of roads through the property, and a stable drawing that appears to have come off the Internet. Even a concept plan would have a little more detail or evidence of what the end project is going to look like if the plaintiff is truly intending to develop this as an equestrian center."

¶ 36    The court noted that, if it could, it would require plaintiff to post a bond sufficient to remove the fill if its plan is subterfuge, but it lacked such authority. The court reversed the Board's decision and remanded for proceedings consistent with its order.[3] The Board appeals.

¶ 37                              II. ANALYSIS

¶ 38                              A. Overview

¶ 39    On appeal, the Board argues that we should not uphold the circuit court's decision, which permits unfettered industrial means to achieve an agricultural end, where the Board determined, based upon sufficient evidence in a well-developed record, that the proposed activity was unnecessary to establish the equestrian center. It notes that, as implicated in *County of Kendall v. Aurora National Bank Trust No. 1107*, 170 Ill. App. 3d 212, 220 (1988), activity can lose protected status when it ceases to constitute a use of the land for the protected purpose, *i.e.*, here, agricultural. The Board notes that, in its role as regulator charged with the duty of enforcement, and based upon sufficient evidence in a well-developed record, it determined that the proposed activity was not

---

[3]Before this court, the Board moved to supplement the record with documents reflecting that, in subsequent proceedings, the trial court denied the Board's motion for a stay pending appeal and that plaintiff has commenced development of the property. It attached those documents to the motion. Plaintiff objected. We denied the motion, yet noted that, if the Board moved *this* court for a stay, it must include the referenced record with that motion. It did not file a motion to stay in this court.

necessary and, thus, did not serve the proposed agricultural purpose. It notes that the mention of an agricultural purpose has no "talismanic power," in that merely identifying a recognized agricultural use of land, an equestrian center, does not open the floodgates to unregulated development. Rather, the operative inquiry requires consideration of whether the development activity is necessary or, instead, nonexempt development activity. The Board contends that the Department's recognition that an equestrian center is an agricultural use of land does not grant plaintiff *carte blanche* use of *any* means of development to establish the equestrian center, and such a position turns the law on its head.

¶ 40    In addition, the Board reiterates that certain comments by its members, before announcing the decision, reflected that they did not believe the equestrian center would ever be established. Similarly, the trial court expressed concern that plaintiff did not "truly" intend to develop this property for an equestrian center. As such, "the generic recognition that an equestrian center is an agricultural use of land does not disempower the Board from performing its regulatory function or otherwise supplant its belief that [plaintiff's] proposed equestrian facility is a foil for unfettered industrial activity." The Board recognizes that the development activity itself is the subject of the analysis, *not* the intent of the owners who seek to develop it for profit. However, it urges this court to not shy away from the inferences drawn from the evidence that plaintiff knew the property was unsuitable for an equestrian center and purchased it anyway to defeat zoning regulations. It urges us to reject plaintiff's position that "businessmen who purchase farmland for industrial development may conjure the agricultural exemption—and divest the regulatory authority of its core powers—by merely *proposing* a recognized agricultural use." Finally, the Board summarizes the evidence and argues that its findings were not contrary to the manifest weight of the evidence and its decision was not clearly erroneous.

¶ 41    In response, plaintiff argues that its purported intent regarding the property and the large amount of fill in its proposal are both red herrings and irrelevant.  It contends that any critiques or complaints that the Board holds about plaintiff's site plan or alleged deficiencies thereof should also be disregarded, because none are pertinent to interpretation of the UDO agricultural exemption.  Rather, plaintiff argues, as it is not disputed that the proposed use, an equestrian facility, is a permitted agricultural one, this case concerns only one straightforward issue: whether the proposed filling and grading on the subject property in the site plan for the equestrian facility is exempted from site development permit requirements under section 151.145(C)(3)(c) of the UDO.  Plaintiff argues that the clear language of the ordinance reflects the agricultural exemption applies, as its proposed agricultural practices, the equestrian center, "involve filling and grading" that will not occur in a regulatory floodplain.  Plaintiff reiterates that there are no limits or qualifications in the exemption regarding the amount of filling and grading, that the Director conceded that he injected a limit or cap on the amount of filling and grading that will be allowed, and that a property owner maintaining or pursuing an agricultural use requiring filling and grading could not rely on the clear language of the ordinance, but would need to *ask* what limit or cap would apply.  Plaintiff contends that the Board conflated the issues of zoning and site development permitting, as filling and grading a development is activity governed by the site development permit process, not the zoning process.  Rather, it notes, filling and grading can occur in any zoning classification and is a process that occurs incident to a specific use and is not, in and of itself, a separate use of the land.  As such, the fact that the Board does not like plaintiff's plans does not justify it framing the fill and grade as a zoning issue and requiring plaintiff to obtain rezoning during the fill and grade procedure and then rezoning it back to agricultural to use the property as an equestrian center.  In conclusion, plaintiff contends that the Board cannot overcome the only

issue that matters, namely, that "the proposed equestrian facility is undisputedly an agricultural use and therefore the proposed filling and grading activity, so long as it is outside any regulatory wetlands, is exempt from any site development permitting requirements." To hold otherwise, plaintiff argues, renders the exemption meaningless because the Board would be entitled to insert, on a case-by-case basis, its own opinion as to what is an "acceptable" amount of filling and grading to deny, on a whim, property owners' attempts to promote the UDO's intent of preserving agricultural uses of land.

¶ 42                               B. Standard of Review

¶ 43     First, we address our standard of review. Judicial review of a zoning board decision is governed by the Administrative Review Law. 735 ILCS 5/3-101 *et seq*. (West 2022); 55 ILCS 5/5-12012 (West 2022). In the administrative-review context, we review the administrative body's decision (*i.e.*, the Board's decision), not the circuit court's. See *Provena Covenant Medical Center v. Dep't of Revenue*, 236 Ill. 2d 368, 386 (2010) ("When an appeal is taken to the appellate court following entry of judgment by the circuit court on administrative review, it is the decision of the administrative agency, not the judgment of the circuit court, which is under consideration.").

¶ 44     Our standard of review of the administrative decision depends on what is disputed. The Board's factual findings are considered *prima facie* true and correct and may be reversed only when against the manifest weight of the evidence. See 735 ILCS 5/3-110 (West 2022); *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006). Under the manifest-weight-of-the-evidence standard, the Board's factual findings will be reversed only where they are unreasonable or not based in evidence, which is "a very high threshold to surmount. So long as the record contains evidence supporting the agency's decision, that decision should be affirmed." *Marconi*, 225 Ill. 2d at 540.

¶ 45    In cases where there exists a mixed question of fact and law, or where the facts are undisputed and the issue is simply whether those undisputed facts satisfy an undisputed statutory standard, the decision will be upheld unless it is clearly erroneous. *Id.* at 532-33; see also *Housing Authority of the County of Lake v. Lake County Zoning Board of Appeals*, 2017 IL App (2d) 160959, ¶ 37.  This standard affords the decision a degree of deference, and it will be considered clearly erroneous only where the reviewing court is left with a definite and firm conviction that a mistake has been committed. *AFM Messenger Service, Inc. v. Dep't of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 46    Finally, if the question before us is whether the controlling statute or ordinance was correctly interpreted, our review is *de novo*. *Id.* ¶¶ 37-38.  Notably, in the administrative-review context, "[e]ven where review is *de novo*, an agency's construction is entitled to substantial weight and deference.  Courts accord such deference in recognition of the fact that agencies make informed judgments on the issues based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent." *Provena Covenant*, 236 Ill. 2d at 387 n.9; see also *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 16; *AFM Messenger Service, Inc.*, 198 Ill. 2d at 394-95.  We also note that, "under any standard of review, a plaintiff to an administrative proceeding bears the burden of proof, and relief will be denied if he or she [or it] fails to sustain that burden." *Marconi*, 225 Ill. 2d at 532-33.

¶ 47    Both parties assert that the clearly-erroneous standard applies here.  However, at this juncture, the decisive issue concerns interpretation of the agricultural exemption in section 151.145(C)(3)(c) of the UDO.  Indeed, plaintiff's position is that the sole "straightforward" issue before us is whether the agricultural exemption applies.  It argues that, because the equestrian center is an agricultural use and its plans for filling and grading lie outside the regulatory

floodplain, "the proposed site plan for the equestrian facility, including the filling and grading, is an approved agricultural use that is exempt from any site development permitting requirements, period." As the Board notes, plaintiff's position is that the only fact that matters, *i.e.*, whether the final proposed use "in a vacuum" is an agricultural one, is undisputed and, thus, suggests *de novo* review. Indeed, plaintiff does not identify any questions of fact or challenges to the Board's findings of fact relevant to the ordinance (*i.e.*, whether the use is agricultural, the amount of fill and grading it has proposed, that alternatives exist (such as drain tiles or more limited and targeted grading), etc.). The question before us concerns whether the Board correctly interpreted the exemption as not encompassing activity of the character plaintiff proposed here. Thus, we deem *de novo* review more appropriate to the determinative issue on appeal.

¶ 48                    C. Board Properly Rejected Plaintiff's Appeal

¶ 49    Having determined that *de novo* review applies, we turn to the ordinance itself. We apply the same rules to interpret an ordinance as used when interpreting a statute; namely, our primary objective is to ascertain and effectuate the drafter's intent in enacting the provision, the best indication of which is the language used, given its plain and ordinary meaning. *Id.* ¶ 48. It is improper for a court to depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed intent; however, words and phrases must not be construed in isolation and must be interpreted in light of other relevant provisions of the statute. *Palm v. Holocker*, 2018 IL 123152, ¶ 21. Indeed, the UDO specifies that, if words and terms used are not specifically defined within the UDO, they "shall be given their common, ordinary meanings, as the *context* may reasonably suggest." (Emphasis added.) Lake County Code of Ordinances § 151.271 (adopted Aug. 9, 2022). Further, we have an obligation to construe statutes in a manner that will avoid absurd, unreasonable, or unjust results

that the drafters could not have intended. *Palm*, 2018 IL 123152, ¶ 21. Moreover, "where a plain or literal reading of a statute produces absurd results, the literal reading should yield." *People v. Hanna*, 207 Ill. 2d 486, 498 (2003); see also *Village of Ringwood v. Foster*, 405 Ill. App. 3d 61, 82 (2010) ("Although a court generally may not read unstated limitations into statutes, it also must interpret statutes so as to avoid absurd results.").

¶ 50    Here, plaintiff argues that the Board erred because the plain language of section 151.145(C)(3)(c) reflects that agricultural practices involving *any* filling and grading are exempt, as long as not performed in a regulatory floodplain. We disagree, as this interpretation reads the ordinance in isolation and leads to absurd results.

¶ 51    As plaintiff acknowledges, section 151.145(B) of the UDO generally provides that a site development permit is *required* for any development that meets certain criteria, including various subsections applicable here. Lake County Code of Ordinances § 151.145(B). However, section 151.145(C) establishes various exemptions to the site-development-permitting requirements, with subsection 3 (at the time of relevant proceedings)[4] providing:

---

[4]It appears that, on March 12, 2024, ordinance 24-0207 passed and amended section 151 of the UDO related to fill and grade operations in unincorporated Lake County. As a result, the agricultural exemption at issue in this case has been removed. Instead, section 151.145(C)(3) currently reads:

"(3)   A site development permit shall not be required for any of the following:

    (a)   The maintenance of existing buildings and facilities such as resurfacing of roadways when the road elevation is not increased;

    (b)   Practices associated with local food gardens that do not involve filling or grading;

    (c)   Fence installation, pole placement, drilling, or other minor auxiliary construction as long as the development activity is not located in a regulatory floodway, wetland, or water body." Lake

"(3) A site development permit shall not be required for any of the following:

    (a) The maintenance of existing buildings and facilities such as resurfacing of roadways when the road elevation is not increased;

    (b) Gardening, plowing, and similar agricultural practices that do not involve filling, grading, or construction of levees;

    (c) Agricultural practices outside of the regulatory floodplain that *involve* filling or grading, including but not limited to the construction of levees, terraces, and surface water diversions that are a part of a Natural Resource Conservation Service designed and approved construction project; or

    (d) Fence installation, pole placement, drilling, or other minor auxiliary construction as long as the development activity is not located in a regulatory floodway, wetland, or water body." (Emphasis added.) Lake County Code of Ordinances § 151.145(C).

¶ 52 It is therefore apparent that subsection (C)(3), as a whole, is meant to exempt from permitting requirements those activities that are relatively minor, low impact, or have been approved and permitted elsewhere. For example, subsection (a) does not require permits to maintain structures that already exist (and, presumably, went through permitting processes when constructed), but distinguishes as nonexempt maintenance of a roadway that increases its elevation, *i.e.*, maintenance that would be impactful. Similarly, subsection (b) is not concerned with common agricultural practices such as gardening and plowing. Notably, however, subsection (b) does *not* include in its list of agricultural tasks that are allowed *without* limitation the acts of

_____

County Code of Ordinances § 151.145(C)(3) (amended Mar. 12, 2024).

filling, grading, or construction of levees. Presumably, if filling and grading were intended to be allowed without limitation, they, too, could have been included in subsection (b). Rather, those three items appear in subsection (c), which references projects that are designed and *approved* by the Natural Resource Conservation Service. Finally, subsection (d) addresses auxiliary construction that is *explicitly* defined as "minor." The tenor, therefore, of section 151.145(C)(3) is that certain minor activities do not require permitting due to the low-impact scope of the activity or because another entity will have assumed responsibility for approving the project. As plaintiff notes, the ordinance serves to exempt the stated activities from the onerous burden of site development permitting processes, but, in our view, it is *because* of the relatively minor scope of the activities identified that a permitting process would *be* an onerous burden.

¶ 53    In addition, the language "including but not limited to" in subsection (C)(3)(c) reflects that its preceding reference to agricultural practices that involve filling and grading is informed by the list that follows. See, *e.g.*, *People v. Perry*, 224 Ill. 2d 312, 328, 330 (2007) ("including but not limited to" is often used to indicate that the list that follows is intended to be illustrative, not exhaustive, and "similar" to the preceding general term). And, again, this concept is somewhat codified in section 151.271 of the UDO, where it provides that terms must be given meaning as reasonably suggested by their context. Lake County Code of Ordinances, § 151.271 (adopted Aug. 9, 2022). Thus, regardless of whether the Natural Resource Conservation Service provision at the end of subsection (C)(3)(c) modifies all examples that precede it or only some, the list of the *types* of activity provided clearly concern activities that are *not* similar to those plaintiff proposes here.

¶ 54    Plaintiff also argues that, because the ordinance does not specifically enumerate limits on the volume of filling and grading within agriculturally-zoned land, to allow the Board or Director to insert their own interpretations of what is "too much" into the UDO would equate to rewriting

the ordinance. However, as noted, plaintiff agrees that the site development permitting process is mandatory, unless an exemption applies. The ordinance, written to exempt relatively-minor activities, necessarily contemplates an assessment by the Department, Director, and/or the Board of what the agricultural practices being proposed *entail*. Plaintiff's position asks only whether the filling and grading is in a regulatory floodplain and removes from the analysis any question of whether the filling and grading proposed is, in fact, *necessary* to the proposed agricultural use, *i.e.*, an equestrian center. And although plaintiff argues now that the exemption does not require that the filling and grading be "necessary" for the proposed agricultural use, plaintiff arguably conceded below that the filling and grading must be "necessary" and, in fact, that this requirement is a component written directly into the ordinance. Specifically, as plaintiff's counsel explained to the Board, the exemption is for agricultural practices that "involve" filling and grading; counsel represented that the common meaning and definition of the word "involve," according to multiple dictionary definitions he researched, is a "necessary part." Indeed, contrary to its position here that the exemption does not require the filling and grading be "necessary" for the proposed agricultural use, plaintiff, in its applications and request for a zoning interpretation, repeatedly described the fill and grading proposed by its plans as "necessary," "required," and "essential." The Director and Board disagreed. The Board agreed with the Director that, based on the evidence, there were alternative ways to construct an equestrian center, such that the proposed filling and grading process was not necessary.

¶ 55 Plaintiff's interpretation also leads to absurd results. Namely, it contends that, if the proposed end use is unquestionably agricultural, then *any* fill or grading it deems "involved" or "necessary" to achieve the *exact version* of the end use it has proposed is exempt from permitting requirements. Taken to an extreme, then, plaintiff would interpret the exemption to mean that a

hypothetical plan involving filling and elevating a property *1,000 feet* across numerous acres (or any height or scale theoretically imaginable) would be exempt, because on top, the property owner wants to farm corn, build barns, and construct silos. It is absurd to think that the ordinance could be read to mean that a property owner can build anything agricultural it wishes, without limitation and without permitting requirements, as long as the fill and grading involve agricultural end use. We must interpret the ordinance to avoid absurd results. *Hanna*, 207 Ill. 2d at 498.

¶ 56    Plaintiff makes much of the fact that the Director conceded that the ordinance does not provide explicit caveats or restrictions on the volume of fill or grading and that the only way a property owner could learn what was permissible is by asking him. Plaintiff contends that allowing this interpretation leaves the exemption with no "teeth," as it allows the Board to insert its own opinion on what is an "acceptable" amount of fill on a case-by-case basis and deny the exemption on a "whim." Similarly, the circuit court was concerned that a property owner would not know what fill would be approved without asking the Director, and that the ordinances do not specify what volume of fill is too much to qualify for the exemption. We disagree. Of course, the Board cannot simply deny the exemption or determine an acceptable amount of fill on a "whim," but, rather, and as it did here, the Board hears and weighs *evidence* on the disputed issues. Further, and as the circuit court recognized, the Director does possess vast authority under the UDO (see, *e.g.*, Lake County Code of Ordinances § 151.032), and whether *any* plans will be approved is always subject to the possibility that they will require modification, whether in the exemption arena or otherwise. Clearly, the UDO itself could *never* specify all possible permutations of proposals and grading and filling activity that owners might claim are necessary to achieve the specific version of the agricultural use they propose, and, of course, agricultural activity that

"involves" (*i.e.*, necessitates) fill and grading and the amount thereof will vary on a project-by-project basis.

¶ 57    We note that the Board cites *County of Kendall* to support its position that we should consider or infer plaintiff's intent for the property is not purely agricultural, as that court noted that enforcing exemptions when the activity on a site zoned agricultural is not, in fact, agricultural, frustrates the intent of the legislature and would "allow the statutory exemption to be manipulated and twisted into a protection for virtually any use of the land as long as some agricultural activity was maintained on the property," rendering the county's zoning power meaningless. *County of Kendall*, 170 Ill. App. 3d at 219. We need not comment on the merits of the Board's point, as our forgoing analysis does not depend on plaintiff's intent. However, we do think the case bolsters our conclusion that whether the proposed activity is "necessary" to the agricultural use remains an inherent part of an exemption analysis. Indeed, the court in *County of Kendall* considered whether the nature of the activity at issue—excavation and removal of sand and gravel from a site, ostensibly to create a pond to serve as an irrigation source for 90 acres of already-planted sod—served an agricultural use or purpose. *Id.* at 215-16. In making that determination, the court repeatedly considered whether the supplementary water supply proposed was "necessary," or "essential" to the sod farm, *i.e.*, the agricultural use. *Id.* at 218. Therefore, although not interpreting the exemption at issue here, the case nevertheless reinforces that whether proposed development is *necessary* to an agricultural purpose is relevant to assessing whether the proposed activity falls within the scope of an exemption.

¶ 58    In addition, we note that the legislature later *changed* the agricultural exemption at issue in *County of Kendall* and a second appeal arose, in which this court noted that, although we had determined in the first appeal that the overall use of land was agricultural in nature and, thus, the

proposed excavation of sand served an agricultural purpose, the changed exemption now meant that, even if serving an agricultural purpose, the excavation work was no longer sheltered under the ordinance. *County of Kendall v. Aurora National Bank Trust No. 1107*, 219 Ill. App. 3d 841, 851-52 (1991). In other words, the County could separately assess whether, even if the end use was agricultural, the proposed related activity was also agricultural. Similarly, here, although plaintiff is correct that the Board found that the proposed end use would be agricultural, we disagree that the exemption precluded it from also determining that the proposed development activity was not.

¶ 59    Finally, the circuit court here noted that the Board's interpretation, requiring rezoning, would be cumbersome and expensive and plaintiff's likelihood of success in obtaining rezoning would be "highly negligible." We respectfully do not believe these considerations serve as a valid basis to reverse the Board's interpretation. Plaintiff, too, argues that the Board's decision was clearly erroneous because it confused zoning with permitting, and its decision requiring plaintiff to seek rezoning for the filling and grading and then, once complete, to obtain zoning back to agricultural zoning, is absurd. We disagree that plaintiff is required to do anything. Namely, plaintiff requested an interpretation and does not agree with it. In our view, the Board's decision is simply holding that, to proceed with the plans as submitted, plaintiff's property would require rezoning because the activity proposed is more similar to warehouse and freight activity than site preparation for an equestrian center. If plaintiff does not wish to pursue rezoning, we presume that it could, theoretically, modify its plans, possibly by incorporating some of the alternatives for addressing its concerns (drain tiles, targeted/limited grading for a driveway, etc.) as noted in the record.

¶ 60                                III. CONCLUSION

¶ 61    For the reasons stated, we conclude the Board's decision was correct, and, therefore, we reverse the judgment of the circuit court of Lake County.

¶ 62    Reversed.